RON GOLD, State Bar No. 52416
OLDMAN, COOLEY, LEIGHTON & SALLUS, GOLD & BIRNBERG
16133 Ventura Boulevard, Penthouse Suite A
Encino, California 91436-2408
Telephone: 818-986-8080
Facsimile: 818-789-0947

Attorneys for Defendant RITA LAVELLE.



# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CVO/ 4 ± 60  SJO

| UNITED STATES OF AMERICA, | ) | **CASE NO.:** **CR 04-00374-SJO** |
|---|---|---|
| Plaintiff, | ) | **DEFENDANTS' MEMORANDUM OF** |
| vs. | ) | **POINTS AND AUTHORITIES SUPPORTING** |
| | ) | **MOTION TO VACATE, SET ASIDE** |
| RITA LAVELLE, | ) | **SENTENCE PURSUANT TO 28 U.S.C. §** |
| | ) | **2255.** |
| Defendant. | ) | |

COMES NOW, Defendant RITA LAVELLE, a person in federal custody, and hereby submits the following memorandum of points and authorities in support of her accompanying motion, pursuant to 28 U.S.C. § 2255, to vacate, set aside, and/or correct her sentence.

## I.   PROCEDURAL HISTORY OF THE CASE

This motion arises from a 15-month sentence imposed on Petitioner-Defendant by this Court, the Honorable S. James Otero, presiding, on January 10, 2005. Judgment against Petitioner-Defendant was rendered by the Honorable S. James Otero on January 10, 2005, and entered on January 14, 2006.  The sentence imposed on the underlying judgment arose from an April 7, 2004 indictment charging Appellant with one count of wire fraud and aiding and abetting (18 U.S.C. §§ 1343, 2(b), and two counts of making false statements to an FBI agent. (18 U.S.C. § 1001) as to which a jury found her guilty on all three counts on September 27,

1  2004.  The jury also found multiple victim and vulnerable victim enhancements on the special

2  verdict form, finding on the special verdict form that at least one victim of the offense was

3  unusually vulnerable due to, *inter alia*, "the victim had cancer," and that "there was more than

4  one victim to the offense."

5       Petitioner-Defendant was initially sentenced on January 10, 2005, wherein this Court

6  applied the 2000  U.S. Sentencing Guidelines, and on that basis imposed a 2-level increase in

7  sentence as a result of the jury's finding on the multiple-victim and vulnerable victim

8  enhancements.  This was part of an overall sentencing analysis which adopted the calculations

9  of the presentencing report, and found a total offense level of 14, a criminal history category of

10  I, and a sentencing range of 15-21 months, This sentencing was handed down two days before

11  the Supreme Court issued its seminal decision in *United States v. Booker* 543 U.S. 220, 125

12  S.Ct. 738, 160 L.Ed.2d 621 (2005).

13       Petitioner-Defendant timely appealed from the aforementioned judgment and sentence,

14  but her appeal was limited by her counsel to four grounds: (1) whether the enhancement for

15  multiple victims was erroneously applied because the fraudulently-obtained money was from

16  but a single source; (2) that the vulnerable victim enhancement was inapplicable as to a

17  corporation; (3) that the jury was not given any beyond a reasonable standard instruction as to

18  the enhancements; and (4) that because the sentencing came just two days before the *Booker*

19  decision, resentencing was required.  *United States v. Lavelle* 146 Fed.Appx. 872, 2005 W.L.

20  2043956 [Docket No. 05-50034] (9th Cir. 2005)

21       Prior to the hearing on the appeal of the sentence, Petitioner filed a request with the

22  Court of Appeals for a substitution of counsel.  Despite the absence of any objection by the

23  People, the Court denied the request and ordered the hearing on the limited appeal to proceed.

24       On June 6, 2005, the Ninth U.S. Circuit Court of Appeals rendered its opinion and

25  decision on that appeal limited to the issue of sentencing, and remanded the case to this Court

26  under the rule enunciated in *United States v. Ameline* 409 F.3d 1073, 1084 (9th Cir. 2005) for

27  the trial court's reconsideration of whether this court "would have imposed the same sentence

28

2

1    had it known that the Guidelines were advisory." *Id.*, 146 Fed. Appx. at 875.

2         On November 15, 2005, this Court acknowledged the Appellate Court's remand re

3    *Ameline* resentencing and ordered the parties to submit memoranda and set a hearing date of

4    January 23, 2006.  By stipulation of the parties, the hearing date was subsequently continued to

5    February 27, 2006.  Petitioner-Defendant submitted her memorandum on February 13, 2006,

6    and the Government its memorandum on February 21, 2006.  On February 28, 2006, this Court

7    permitted consideration of certain new evidence which could have been developed at the time

8    of the original sentencing hearing, permitting its consideration of a psychological report

9    previously submitted by the Petitioner-Defendant on February 23, 2006, in support of

10   resentencing under *Ameline*.  This included several letters attesting to Petitioner's good

11   character and requesting her assistance via community service for various non-profit

12   enterprises.

13        On March 27, 2006 this Court issued a further Order in response to Ninth Circuit's June

14   6, 2005 Opinion and Decision stating in two sentences that "[a]fter reviewing the case file, the

15   parties' briefs regarding resentencing, as well as additional evidence offered by Petitioner-

16   Defendant, the Court determines that the sentence imposed by the Court is sufficient but not

17   greater than necessary to meet the goals of sentencing.  18 U.S.C. § 3553(a).  Accordingly, the

18   sentence would not have been different had this District Court known that the Guidelines were

19   advisory."  The March 27, 2006 order did not discuss any of the goals and factors enumerated

20   in § 3553(a), nor state that it has considered any of the other standards reflected in that Section.

21   Nor did this District Court's March 27, 2006 Order explain any of the reasons underlying its

22   sentence selection.

23        Accordingly, Petitioner-Defendant again timely appealed from this Court's March 27,

24   2006 Order, asserting that such order was not compliant with the Ninth Circuit's June 6, 2005

25   Order and constituted an ineffectual *Ameline* review, notably in failing to articulate

26   consideration of the 28 U.S.C. §3553(a) factors and to explain its reasons underlying its

27   sentence selection, (as the Ninth Circuit recently mandated in *United States v. Hernandez* 197

28

1    Fed.Appx. 556 (Aug. 8, 2006)).  Petitioner's Defendant's appeal asserted that these failings

2    have prevented the reviewing Court from conducting the reasonableness review entrusted to it

3    by *Booker*, which was the sole reason for the Appellate Court's June 6, 2005 remand of

4    sentence to the District Court to begin with.  Accordingly, Petitioner-Defendant's appeal

5    requested remand for resentencing in accordance with the procedural requirements of *Ameline*

6    and *Hernandez*.  That appeal is still pending and oral argument has not yet been scheduled,

7    presumably due to the presently unsettled questions of what the proper sentencing criteria and

8    guidelines are and/or should be, which have yet to be decided by the Ninth Circuit or Supreme

9    Court.[1]  Indeed, as the Ninth Circuit has just restated in *United States v. Ressam* 474 F.3d 597,

10

---

11    [1]    Petitioner-Defendant notes that the Ninth Circuit Court on August 25, 2006, issued an order
requesting further briefing in *United States v. Carty, Zavala*, in many of the issues extant on her pending
12    appeal. *See*, 465 F.3d 976. Therein, the Ninth Circuit Court stated *en banc*: "The court invites supplemental
briefs by the parties addressing some or all of the following questions on the role of the United States
13    Sentencing Guidelines in a district court's sentencing decision after United States v. Booker, 543 U.S. 220,
125 S.Ct. 738, 160 L.Ed.2d 621 (2005): 1. Do we have jurisdiction to review appeals of within-Guidelines
14    range sentences? 2. If we have jurisdiction to review within-Guidelines range sentences, are such sentences
15    entitled to a presumption of reasonableness, or should we review such sentences no differently than we
review outside-Guidelines range sentences? If within-Guidelines range sentences are entitled to a
16    presumption of reasonableness, is this presumption conclusive? Rebuttable? If rebuttable, how can such a
presumption be rebutted? 3. How should we review a post- *Booker* sentence for reasonableness? Do we
17    review only whether the district court complied with *Booker*'s mandate to consider the 18 U.S.C. § 3553(a)
factors? If so, is this review de novo? Do we independently review the sentence imposed for reasonableness?
18    If so, how do we determine whether a sentence is reasonable? What legal and factual matters, if any, must
19    we consider? Is this review for abuse of discretion? Are factual findings decided by the district court
reviewed for clear error, abuse of discretion, or on some other standard of review? Does it matter whether
20    the findings are pertinent to the calculation of the advisory Guidelines range or pertinent to the application
of the other 18 U.S.C. § 3553(a) factors? 4. What procedure is a district court required to follow in
21    sentencing a defendant within the advisory Guidelines range? In particular, what should be the district court's
22    duty, if any, to articulate its consideration of the section 18 U.S.C. § 3553(a) factors? 5. If distinct from the
procedure for within-Guidelines range sentences, what procedure is a district court required to follow in
23    sentencing a defendant above or below the advisory Guidelines range? 6. What weight does the advisory
Guidelines range have, in relation to other 18 U.S.C. § 3553(a) factors? In conducting a sentencing
24    proceeding, may a district judge announce that he will impose a sentence within the advisory Guidelines
25    range unless the parties present compelling reasons for imposing a sentence outside of that range? On
review, should we determine whether the district court has given the advisory Guidelines range the
26    appropriate weight, and if so, how?"  Briefs were to be filed by September 15, 2006 on this matter.
Obviously, this recent development raised the disturbing question as to what in fact are the currently-
27    applicable guiding principles applicable to review of *Ameline* remand sentences, which is the sole issue on

28

4

---

1  (2007 WL 92626):

2  "Even more significantly, the law applicable to sentencing is in flux. We are
   rehearing two cases en banc, *United States v. Carty*, 453 F.3d 1214 (9th
3  Cir.2006) *reh'g en banc granted*, 462 F.3d 1066 (9th Cir.2006), and *United States
   v. Zavala*, 443 F.3d 1165 (9th Cir.2006) *reh'g en banc granted*, 462 F.3d 1066
4  (9th Cir.2006), and the United States Supreme Court has granted writs of
   certiorari in *Claiborne v. United States*, 75 U.S.L.W. 3243, 3246 (U.S. Nov. 3,
5  2006) (No. 06-5618), and *Rita v. United States*, 75 U.S.L.W. 3243, 3246 (U.S.
   Nov. 3, 2006) (No. 06-5754), which will have a good deal to say about the
6  sentencing process in the wake of *United States v. Booker*, 543 U.S. 220, 125
   S.Ct. 738, 160 L.Ed.2d 621 (2005). As the district court should have the initial
7  opportunity to impose a sentence consistent with evolving law, we leave it to that
   court's discretion to defer resentencing until the Supreme Court has decided
8  *Claiborne* and *Rita,* or we have decided *Carty* and *Zavala.*"

9  Petitioner-Defendant had been on bond until her sentencing. This Court's March 27, 2006

10  order commanded that the Petitioner-Defendant surrender herself to custody on April 10, 2006.

11  Petitioner-Defendant's ex parte application of March 30, 2006 to this Court for bail pending

12  appeal was denied on April 3, 2006. Thereafter, shows that Petitioner-Defendant's April 7,

13  2006 emergency motion made to the Ninth Circuit Court of Appeals to permit her to remain

14  free on bond pending disposition of her appeal was ultimately denied by that Court on May 26,

15  2006. Petitioner-Defendant thereafter surrendered and has since remained confined serving her

16  15-month sentence at the Federal Correctional Institute in Dublin, California.

17  **II.   HISTORICAL FACTUAL BACKGROUND**

18  Petitioner-Defendant Rita Lavelle was born in 1947, the oldest of eight children. She

19  graduated from college in 1969 and soon began to work for Ronald Reagan, who was then the

20  governor of California. After Mr. Reagan was elected President, he appointed Ms. Lavelle,

21  then age 34, as second-in-command at the U.S. Environmental Protection Agency with

22  responsibility over the toxic "Superfund" Hazardous Cleanup Program.

23  Following her departure from office in 1983 amidst a highly politically charged EPA

24  controversy, she founded NuTech, a company that helped small businesses and state and local

25  agencies comply with environmental and other safety requirements. DeNova Environmental

26  

27  review on Petitioner-Defendant's appeal.

5

28

was an EPA-permitted trash storage and transfer facility (sending combined trash and waste to other EPA-permitted Disposal/Recycle facilities).   DeNova's permit allowed it to store 26,500 gallons of hazardous waste on its premises, but it was housing more than double its capacity: more than 60,000 gallons of hazardous waste. One of NuTech's other clients at the time was Lemco, a Los Angeles-based surplus commodity exchange company which had been owned and operated by Mr. Joseph Bertelli for more than 25 years.

In early 2001, an FBI agent named Annette Freihon prepared a search warrant, supported by a lengthy affidavit, for DeNova's facilities (which warrant had nothing to do with Ms. Lavelle or Lemco).   While searching DeNova's premises, Agent Freihon saw documents that mentioned Rita Lavelle.

Documents about Ms. Lavelle and NuTech were  at DeNova because Ms. Lavelle had been assisting De Nova with regulatory compliance issues and because NuTech had sent several NuTech clients to DeNova for transfer of client wastes to other permitted disposal/recycle facilities. This business relationship had existed for at least five years prior to Agent Freihon's service of her search warrant.

Approximately six months before the search of DeNova by Agent Freihon in August, 2000, DeNova had become seriously delinquent in paying NuTech's bills (even though NuTech was current with DeNova), with an outstanding balance due NuTech of over $80,000.   As a direct result, NuTech found itself in financial distress.[2] Ms. Lavelle had spoken to Bob Cole, DeNova's owner, who had requested additional services from Ms. Lavelle  Ms. Lavelle advised that she could no longer provide assistance until DeNova's account was brought current. However, because DeNova's delinquencies had impacted NuTech's cash flow, Ms. Lavelle offered to discount DeNova's outstanding invoices of slightly over $80,000 by 50 percent to

[2] In 2000, NuTech had seen nonpayment of invoices from six clients, among whom were DeNova for $85,000 and Lemco for in excess of $120,000.  Despite these slow-pay delinquencies, however, both had been good clients of NuTech and neither NuTech nor Ms. Lavelle had any motives to betray either of the "bread-and-butter" clients, as the government as disingenuously asserted.

6

approximately $40,000 if DeNova paid promptly and agreed to keep its account current within 30 days.  Mr. Cole contacted Ms. Lavelle a few days thereafter and advised that he had just reviewed bids provided to NuTech and wanted to factor an approved bid for work to be completed for NuTech client, Lemco.  The bid which had an approved purchase order was for transfer of several hundred 55-gallon drums of solvent and cleaning agents to a permitted reclaim facility.  The approved bid was for approximately $52,000 and had been included in written project reports to over 16 governmental agencies including:  the EPA Region IX, the Department of Justice "Environmental Unit," and Agent Freihon.

Mr. Cole suggested that he could bring the NuTech account current by obtaining an advance against the to be completed Lemco work from DeNova's factoring company, Capital Partners.[3]  Mr. Cole also suggested that Capital Partners could advance the money within a few days to DeNova as part of Capital Partners' bi-monthly advances.  Capital Partners, a factoring company, had already approved DeNova's credit and Cole's pledged personal assets.  Based on these approvals, Capital Partners had advanced several hundred thousand dollars to DeNova, ensuring timely cash flow for the company.[4]

Because Mr. Cole was in critical need of NuTech and Ms. Lavelle's services, he requested that Capital Partners draw out approximately $36,000 from DeNova's bi-monthly deposits and forward a Bank Check directly to NuTech.  Capital Partners drew a Bank Check on their account with the Bank of Stockton in Stockton, California and forwarded it to NuTech.  Ms. Lavelle deposited the check into NuTech's account with Wells Fargo in Oceanside,

---

[3]/     Capital Partners was a California-based factoring company. Factoring, as defined in Civ.C. §§ 2026, 2367, *et. seq.,* involves the purchase by one company of another's accounts receivables at a discounted price, with the purchaser receiving an assignment of rights to collect the face value of the receivables from the former company's/assignor's debtors. DeNova was a client of factoring company, Capital Partners.

[4]/     Although Capital Partners was in the business of advancing monies based on accounts receivable, the companies had a contract which pledged Cole's and DeNova's assets as additional collateral against all of DeNova's receivables. The creditworthiness of a DeNova receivable was not a component of that agreement - just the aggregate of the pledged collateral. Thus all advances to DeNova were based on DeNova's creditworthiness - not Lemco or any other client (actual or potential).

7

California. When the check cleared, Ms. Lavelle immediately resumed work on DeNova's problems, working several weekends and evenings of overtime as well.[5]

During the next two months, NuTech completed additional cleanup at the Lemco site. Having started over five months earlier, NuTech had brought the site into state and local requirements for safety and had organized everything for final off-site reclaim, recycle, or disposal. Lemco's disorderly 1.5 acre site contained more than 1,500 unlabeled barrels of surplus products, as well as numerous pallets of building materials, and tons of trash debris, metal, glass, newspapers, large engine parts, and heavy machinery. NuTech employees had tested, identified, segregated, labeled, re-packaged and created an inventory of the entire site. The site was brought into compliance with local and state building and fire codes, and over 35 dumpsters each containing forty cubic yards of solid trash as well as several truckloads of repacked products had been moved to off-site reclaimers or trash dumps. In October 2000, Ms. Lavelle was notified that in spite of two series of sampling and tests by the EPA contract laboratories (who verified that the site was *not* an imminent and/or substantial danger to the environment) the Lemco business project and property was being "federalized" by EPA Region IX, Agent Freihon and the U.S. Attorney - Environmental Unit. Ms. Lavelle challenged the EPA and Department of Justice seizure as improper and illegal consistent with Superfund laws. While Mr. Bertelli and Ms. Lavelle quitted the property, a formal request for review was sent to the EPA and to the Department of Justice, for the hearing on the seizure and eviction.

EPA staff and cleanup contractor arrived at the site and were given the keys, a computerized inventory and a workplan to complete the cleanup. Ms. Lavelle and NuTech notified all approved project vendors (including DeNova) of the federalization and provided contact information for the EPA and Department of Justice designated cleanup contractor.

---

[5]/    Although Capital Partners advanced monies based on their clients' accounts receivables, the advance to DeNova was based on an approved purchase order. As shown by the paperwork surrounding the advance at issue, all parties involved had full knowledge that the work was to be completed at a future date. Capital Partners fully acknowledged that Lemco did not owe DeNova any monies because the work had not yet been started.

8

Within a few weeks of the challenged federal seizure, Capital Partners sent an invoice for DeNova with a substitution of payee notice to Lemco. The invoice on DeNova letterhead had been written up by a DeNova employee and forwarded to Capital Partners. Mr. Bertelli forwarded the DeNova invoice to Ms. Lavelle who immediately went to DeNova and Capital Partners' offices to correct the situation of improper invoicing for work that never had been done. Mr. Bertelli had given Ms. Lavelle a broad power of attorney for "everything under the sun" (as Mr. Bertelli testified at the Petitioner-Defendant's trial).[6] Both companies apologized for the error and Ms. Lavelle continued her challenge of the EPA and Department of Justice's federal seizure of Lemco[7].

Unbeknownst to Ms. Lavelle, in early 2001, Agent Freihon had begun an investigation of Ms. Lavelle and had gone to NuTech's offices, taking several files, records and other items. Ms. Lavelle was never informed of these confiscations and to date has yet to see a search warrant, subpoena, or any inventory of the items so seized by Agent Freihon.

By 2002, Agent Freihon successfully convinced Mr. Bertelli to drop his challenge to the federal seizure of his assets and to sign his property over to the EPA's designated receiver. Mr. Bertelli then contacted Ms. Lavelle and stated that he did not want to fight the government any more, but Ms. Lavelle pledged that she would take the case to the Inspector General, several Congressional committees, and Washington D.C.-based EPA staffers for further investigation. Ms. Lavelle also told Mr. Bertelli that she would investigate the filing of an action within the

---

[6]/   At trial, Mr. Bertelli did not believe he himself had seen or signed any of the documents used by the prosecution to assert he was somehow liable to Capital Partners or DeNova for the factor advance from Capital Partners to DeNova. He did remember, however, that the waste was never sent to DeNova because of the DOJ/EPA/Freihorn federalization and seizure of his property. Thus he had continued to resist attempts by both companies to collect from him for work never done.

[7]/   Capital Partners testified that it had recouped in excess of $56,000 for the $36,000 it had advanced to DeNova in late August (allegedly against the approved Lemco purchase order for to be completed work). Capital Partners testified that it had done this by withholding from the bi-monthly advances to DeNova for other assets. This was months before Agent Freihorn, executing her search warrant, ever found the documents that mentioned Rita Lavelle.

9

1  U.S. Claims Court for the recovery of Fifth-Amendment just compensation for Mr. Bertelli
2  arising from these takings.

3  In October, 2002, the U.S. Attorney Environmental Unit issued a letter that Ms. Lavelle
4  was under investigation for hazardous waste violations.  Ms. Lavelle immediately contacted the
5  U.S. Attorney and requested a meeting to clarify and answer any questions.  That meeting was
6  held on October 17, 2002 in the U.S. Attorney's Los Angeles offices with Attorney Johns,
7  Attorney Kim and Agent Freihon present.  Ms. Lavelle cooperated fully.   The government
8  asked her several questions concerning DeNova's operations.  This was the very same group of
9  governmental officials which had by now federalized and seized DeNova's and Mr. Cole's
10  assets, and had brought in the very same cleanup contractor again using the Superfund
11  authorities which Ms. Lavelle was then challenging for Mr. Bertelli and Lemco.   During the
12  meeting, the government inquired from Ms. Lavelle about Capital Partners' factoring of
13  DeNova assets, about NuTech's cleanup efforts at Lemco, and about DeNova's payment of
14  NuTech invoices.  Specifically, the government seemed concerned about certain false invoicing
15  by DeNova and Capital Partners of NuTech clients — with special interest on Ms. Lavelle's
16  memoranda regarding this false invoicing of Lemco.  During the investigation, Ms. Lavelle
17  gave handwriting exemplars, voluntarily testified before the Grand Jury even though she was
18  not represented by a lawyer, and voluntarily met with federal prosecutors and Agent Freihon,
19  again unrepresented by a lawyer, while at the Grand Jury, while meeting with the case agent
20  and prosecutors, and while giving exemplars.  During all of these meetings, no copies of the
21  documents at issue were furnished to Ms. Lavelle, and the government further refused to show
22  any of the documents to her.

23  The October 17, 2002 meeting later gave rise to the second and third counts of the
24  indictment.

25  After the government had spoken with her for several hours, Agent Freihon and
26  Attorney Kim asked Ms. Lavelle to write out a declaration describing how she had happened to
27  receive a check from Capital Partners, and Ms. Lavelle did so. Of course, this handwritten

28

10

account was based on Ms. Lavelle's memories of what had happened more than two years earlier. Subsequent to this meeting, Ms. Lavelle voluntarily testified before the Grand Jury, gave handwriting exemplars, and answered several additional questions. She fully cooperated and voluntarily appeared even though she was not represented by counsel. The October 2003 Grand Jury heard Ms. Lavelle questioned by U.S. Attorney Johns and Attorney Kim for two (2) days and told her there would be no indictment. The foreman made a special effort to thank Ms. Lavelle for her willingness to appear and explain events - including her challenge to the federalization of now several properties by this DOJ Unit and EPA under Superfund. It was during this appearance that Ms. Lavelle realized that Agent Freihon had taken files, documents, and other items from NuTech offices in early, 2001 when NuTech closed its doors and contracted with the premises's landlord for storage of all office items until reopening for business. Ms. Lavelle was shown various memoranda and even a copy of the Bank Check from Bank of Stockton to NuTech for approximately $36,000.

Ms. Lavelle and Mr. Cole were indicted on April 7, 2004, on one charge of wire fraud and aiding and abetting (18 U.S.C. §§ 1343, 2(b)); Ms. Lavelle was additionally charged with two counts of having made a false statement to Agent Freihon (1 8 U.S.C. § 1001). After the Supreme Court issued its decision in *Blakely* v. *Washington, supra,* a superseding indictment was returned. The only relevant change between it and the initial indictment was a paragraph in the wire fraud count headed : "Additional Allegations.'' This paragraph charged that the loss from the offense was more than $30,000, and that Ms. Lavelle and Mr. Cole ""knew and should have known that at least one victim of the offense was unusually vulnerable due to: (I) the victim's age and (ii) the victim's physical condition, including that the victim had cancer."

Mr. Cole plead guilty to count 1 of the superseding indictment (wire fraud) on September 14, 2004. One week later, Ms. Lavelle went to trial on all three counts. (Mr. Cole did not testify at trial. He nevertheless received a reduction in sentence for what the government vaguely described as his cooperation, and was ultimately sentenced to just twelve months of probation.) Before trial, the government and the defense agreed, in light of *Blakely,*

11

to a bifurcated trial, with a trial on sentencing enhancements to take place if the jury convicted Ms. Lavelle of wire fraud. This District Court rejected that request but asked the defense to file a pleading about why a bifurcated trial would be desirable. The defense did so, noting that *United States v. Ameline*, which was then controlling law, permitted a district court to "convene a sentencing jury to try [sentencing enhancements], which if proven beyond a reasonable doubt, may be used to increase [a] sentence." *See United States v. Ameline* 376 F.3d 967, 983 (9th Cir. 2004), *amended*, 400 F.3d 646 (9th Cir.), *reh'g en banc granted*, 401 F.3d 1007 (9th Cir. 2005). The defense asked that a sentencing jury be convened only if the government obtained a guilty verdict on the wire fraud count. But this District Court denied the request, and a special verdict form was submitted to the jury.

Under the special verdict form, Ms. Lavelle's jury was not just required to return a verdict of guilty or not guilty. It was also required to answer three questions about sentencing enhancements as to count 1 (wire fraud) if it found Ms. Lavelle guilty of that count: whether the loss was greater than $30,000, whether any victim was unusually vulnerable due to age or physical condition, and whether more than one victim existed. *See* U.S.S.G. § 2F1.1, comment. (n.4) (Nov. 1, 2000); U.S.S.G. § 3A1.l(b).

The jury was not told how to decide who was a victim. Nor was it told what standard of proof to use in deciding whether any of the enhancements applied.  Instead, it was simply told that the government must prove every element of each offense beyond a reasonable doubt. All the elements of the three offenses were listed and defined. However, these allegations were not among them. Moreover, the Court instructed the jury that the government did not have to prove that Ms. Lavelle actually committed the crime — but that it was sufficient if she merely thought of doing it.

On September 27, 2004, the jury convicted Ms. Lavelle of all three counts. It answered all of the questions in the special verdict form in the affirmative.

Ms. Lavelle was sentenced on January 10, 2005, just two days before the Supreme Court issued its decision in *United States v. Booker*. The sentencing guidelines were therefore applied

12

in their then-mandatory form.  Some confusion existed about which version of the guidelines to apply.  The version of the guidelines in existence on November 1, 2000, when the wire fraud offense was completed, grouped the three convictions under U.S.S.G. § 2F1.1. The version in existence on November 1, 2001, when the other two offenses occurred, grouped the convictions under U.S.S.G. § 2B1.1. Section 2F1.1 imposed a four-level enhancement for a loss of more than $30,000, while § 2B1.1 imposed a six-level enhancement for that amount of loss. But § 2F1.1 provided for a two-level increase if more than one victim had been defrauded, while § 2B1.1 did not. At sentencing, this District Court found the difference in the versions to be irrelevant.

Like this District Court, the presentence report used the version of the guidelines issued in November, 2001. The presentence report calculated Ms. Lavelle's base offense level as 6, and added six more levels to reflect the jury's finding of a loss of more than $30,000. *See,* U.S.S.G. §§ 2B 1.l(a), 2B 1.l(b)(l)(D).

Critical to this motion, the report also added two levels in accordance with the jury's finding that a victim of the offense had been vulnerable, pointing to Mr. Bertelli's age and status as a sufferer of cancer during the offense.   U.S.S.G. §  3Al.l(b)(l). This added up to an offense level of 14.   Combined with a prior criminal history category of I, the total offense level of 14 yielded a sentencing guideline range of 15-21 months.

This District Court imposed its sentence relying in  part on the jury's (uninstructed) verdict and its own agreement with that verdict as to Mr. Bertelli's vulnerability, thereafter imposing instead a sentence of 15 months in custody and two years of supervised release. Somewhat contradictorily however, no restitution was ordered as the trial court found there was no loss and no victim.

## III.   PETITIONER IS ENTITLED TO RELIEF UNDER 28 U.S.C. § 2255, AS SHE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

28 U.S.C. § 2255 requires a prisoner's sentencing court to release him or her if the prisoner's sentence was imposed in violation of the Constitution of laws of the United States, if

13

the court was without jurisdiction to impose the sentence, if the sentence exceeded the maximum authorized by law, or if the sentence is otherwise subject to collateral attack. The statute provides that of the court finds for the prisoner, it may resentence him (or her) or set aside the conviction, as is appropriate.

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Frazer v. United States*, 18 F.3d 778, 782 (9th Cir.1994). To prevail on a claim of ineffective assistance of counsel, petitioner must show his attorney's performance was unreasonable under prevailing professional standards; and that there is a reasonable probability that but for counsel's unprofessional errors, the results would have been different. *United States v. Blaylock*, 20 F.3d 1458, 1465 (9th Cir.1994) "*Strickland* defines a reasonable probability as 'a probability sufficient to undermine confidence in the outcome.' " *Id.*

Claims of ineffective assistance of counsel are properly raised for the first time on this Section 2255 motion. *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). Both this Court and the Court of Appeals reviews ineffective assistance of counsel claims de novo. *See, United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir.1991).

Petitioner-Defendant asserts that she was denied effective assistance of counsel at the trial of the underlying charges, in the following particulars:

1.      Despite the fact that no competent evidence was admitted at trial which showed that Joseph Bertelli was stricken with cancer at the time of the offenses at issue, i.e., in and after August, 2000,  and the Government only asserted in opening statement and in closing argument that he was a cancer *survivor*, i.e., that he had previously suffered from cancer at one time in the past and had thereafter recovered. Counsel for Petitioner-Defendant failed properly to move under Rule 29 for dismissal of the vulnerable victim enhancements, and further

14

erroneously admitted in closing argument that Mr Bertelli was a cancer victim, despite the undisputed absence of any such evidence, thus directly causing a 2-level increase in sentencing imposed on Petitioner-Defendant;

2.    Counsel for Petitioner-Defendant never requested special jury instructions defining "vulnerable victim" or "multiple victim" to enable the jury to reach the conclusion that Mr. Bertelli was not a victim, let alone a vulnerable victim. If requested, these would have given the jury proper criteria to acquit Defendant on such enhancements based on the undisputed evidence, and thus would not have caused a 2-level increase in sentencing imposed on Petitioner-Defendant;

3.    Counsel for Petitioner-Defendant, failed to obtain a copy of the Bank of Stockton check made payable to NuTech Enterprises and deposited in its Wells Fargo Oceanside California account as shown to Ms. Lavelle during the Grand Jury proceeding. This would have clearly undermined the prosecution's assertion of "wire" fraud and thus eliminated federal jurisdiction for a criminal act brought on these grounds, as there was consequently no interstate financial transaction at issue. Counsel for Petitioner-Defendant further failed to object to the unfounded and incompetent testimony from documents they had never seen, authored or prepared of Government witnesses Cynthia Chavez of Wells Fargo Bank and Kelly Sanford of the Federal Reserve Bank in Kansas City, that a certain wire transfer had occurred in August, 2000, and counsel further failed to cross-examine Ms. Sanford at all on her lack of competency, permitting such evidence to be admitted unrebutted, thus directly supporting the first charge/count of wire fraud, which led to the jury's verdict and sentence under attack herein;

4.    Counsel for Petitioner-Defendant, despite the admonishment in advance by the trial judge in doing so would open up the Petitioner-Defendant to cross-examination, nonetheless called Petitioner-Defendant to the stand on her case in chief in violation of her fifth-amendment right against self-incrimination, and exposed her to cross-examination by the Government in an unrelated alleged fraudulent factoring scheme involving a John Lind, as a result of which the Government was permitted to pose numerous questions to the Petitioner-

15

Defendant during cross-examination which falsely and unfairly suggested she had previously engaged in a recidivistic pattern of fraud, which directly resulted in her conviction by the jury on the three counts at issue.[8]

Furthermore, counsel's direct examination of the Petitioner-Defendant:

A.   Never had Petitioner explain the Bertelli project and how the real victim was NuTech for the loss of over $120,000;

B.   Never questioned or challenged the illegal seizure of documents presented in discovery which were taken wrongfully and without a valid subpoena or search warrant from NuTech and DeNova by Agent Freihon;

C.   Never raised Ms. Lavelle's challenge to federalizing and seizure of several properties by this DOJ Environmental Unit and EPA Unit. By the time of the trial, several challenges were submitted including those for John Lind's trucks and property and for Lemco and Bertelli's properties. These challenges bore directly on lack of good faith motivation for bringing the charges, and spoliation of documentary evidence which could and would have exculpated Ms. Lavelle;

D.   Never objected to continuing, improper prosecution references to the John Lind episode even after the trial court had already ruled (that it could not be considered) during pre-trial motions and again during trial;

E.   Never called any supporting witnesses for Ms. Lavelle, nor introduced critical evidence in cross-examination of Mr. Bertelli, in regard to his

---

[8]/   At no time did counsel properly object to such improper examination regarding Mr. Lind, the owner of a trucking firm who was awaiting sentencing by this same Department of Justice Environmental Unit for 4year-old charges, whose property, trucks and assets had already been seized by this same unit under Superfund authority. In addition, once again, the document shown to the Petitioner-Defendant during this cross-examination was taken from NuTech files wrongfully, did not involve Lemco, and had Lind's name written on the back, and thus was not offered by the Government as relevant evidence in good faith. Yet no objection by counsel to that document was properly tendered, again permitting the jury to draw improper and factually unsupported incriminating inferences against Ms. Lavelle.

16

transfer of property to the EPA's designee the same week the EPA and Department of Justice-Environmental Unit dropped approximately $250,000 of alleged "response costs" against Mr. Bertelli, disclosing substantial bias on the part of the witness;

F.   Never introduced the NuTech invoice of Lemco for over $120,000 for work completed at Lemco, nor introduced evidence showing that the alleged DeNova "personal guaranty" to Capital Partners was nothing more than a substitution of payee for work to be completed at the Lemco site, which again would have undermined the prosecution's claim of fraud;

G.   Counsel failed to explore the bias, conflicts of interest, and motivations behind the prosecution by the Environmental Unit of the Department of Justice for the alleged "white collar crime," evidenced by the Unit's entrapment efforts coming on the eve of Ms. Lavelle's anticipated testimony against the Unit in upcoming administrative hearings for the illegal search and seizure of several properties and businesses as well as abuse of authority and trust under the Superfund laws;

H.   Never effectively cross-examined Agent Freihon on her motivation for discrediting and publicly humiliating the Petitioner-Defendant with entrapment before the April 2004 Grand Jury versus that of October 2003, as well as on communiques from the Department of Justice and EPA officials who were then being investigated by the Inspector General and several congressional committees.

5.   Petitioner-Defendant's counsel failed to raise the failure of the Government to produce any indictment ever signed by the Grand Jury foreman as a complete defense to the charges, as mandated by Fed.R.Crim.Proc.R. 6(c).

All of these citations of error by counsel are grounds for granting this motion based on ineffectiveness of counsel.

17

There can be little doubt that where the undisputed evidence at trial showed: (1) that Mr. Bertelli was not suffering from cancer at the time of the offenses, as the jury nonetheless so found, and (2) that defense counsel had nonetheless erroneously admitted that he was so suffering which the evidence clearly contradicted (even the Government slyly asserted in opening statement and in closing argument that he had merely been a "cancer survivor"), and (3) that defense Counsel's failure to move for dismissal of such enhancements and further inappropriate and unfounded *admission* on his client's behalf of such unestablished fact at trial was clearly below the applicable standard of care for criminal defense counsel, and directly caused the jury to make their findings causing a 2-level enhancement in Petitioner-Defendant's sentence.

Similarly, our Ninth Circuit Court has repeatedly held that the failure by counsel to request proper jury instructions on contested issues constitutes the ineffective assistance of counsel sufficient to warrant relief under 28 U.S.C. § 2255. *See, United States v. Span* 75 F.3d 1383, 1387 (9th Cir. 1996). Here, despite protesting on appeal the absence of jury instructions for the jury's guidance on the vulnerable and multiple victim enhancements, defense counsel offered no such instructions at all, thus leaving the jury no guidance whatsoever within which to determine what the standard of proof as to such findings was required to be, nor any guidance as to what these terms even meant. Had defense counsel properly offered such appropriate instructions, given the undisputed absence of evidence that Mr. Bertelli was a victim at all, let alone a "vulnerable victim," there can be no doubt the jury would not have found Petitioner-Defendant guilty of such enhancements, and the 2-level increase in sentence would not and could not have been imposed.

Defense counsel's failure to object to the unfounded and incompetent testimony of the government's witnesses offered to prove that a wire transfer ever occurred when, had such objections been timely and properly interposed, no such evidence would have been extant on the record, and there would have been no basis for the jury's finding of guilt on the Defendant's part on the First Count of "wire fraud," thus likewise substantially reducing the

18

aggregate sentence (even had the jury still found Defendant guilty of the Second and Third Counts). Such conduct was clearly also below the applicable standard of care for criminal defense counsel, and directly caused the jury to make their findings of guilt on the First Count, resulting in a substantially harsher sentence than otherwise would have been the case.

Defense counsel's brazen decision to put Defendant on the stand on her case in chief to offer testimony which the Court openly told him in advance would tender at issue and expose his client to highly damaging cross-examination on prior unrelated alleged fraudulent activities involving Mr. Lind, in manifest violation of her constitutional Fifth Amendment rights to remain silent, directly caused this highly damaging testimony to be admitted against Defendant on cross-examination, as the Court had forewarned. Again, it was clearly below the applicable standard of care for criminal defense counsel to have done so, especially in light of the Court's up-front admonishment.[9]

Finally, defense counsel failed altogether to object at any time to the absence of any evidence of any genuine indictment ever handed down by the foreperson of the October Grand Jury as required by Rule 6(c).

Each of these failings individually, let alone collectively, establish a reasonable probability that but for counsel's unprofessional errors, the results would have been different. *Blaylock, supra*, 20 F.3d at 1465. Moreover, "*Strickland* defines a reasonable probability as 'a probability ***sufficient to undermine confidence in the outcome.*' " *Id.*

## IV. PETITIONER'S APPEAL OF HER SENTENCE HAS BEEN UNREASONABLY DELAYED BY THE NINTH CIRCUIT AND U.S. SUPREME COURT'S INABILITY TO DATE TO RENDER DECISIONS ON POST-BOOKER AND AMELINE RESENTENCING TANTAMOUNT TO DENIAL ALTOGETHER OF HER RIGHT TO ANY EFFECTIVE JUDICIAL REVIEW.

Additionally, as a result of the "flux" in appellate review of federal court sentencing post-*United States v. Booker* 543 U.S. 220, 125 S.Ct. 728, 160 L.Ed.2d 621 (2005), Petitioner-Defendant's right to pending meaningful appellate appeal of her sentence has been effectively

---

[9] Counsel never even voiced an objection and failed to adequately question on direct examination.

19

curtailed altogether.  Petitioner's pending appeal, which seeks the Ninth Circuit Court's review of this Court's resentencing under *United States v. Ameline,* 409 F.3d 1073 (9th Cir. 2004) pursuant to *United States v. Plouffe* 445 F.2d 1126, 1128 (9th Cir. 2006).

On August 25, 2006, while her appeal was pending, the Ninth Circuit Court issued an *en banc* order requesting further briefing in *United States v. Carty,* 453 F.3d 1214 (9th Cir.2006) and *United States v. Zavala,* 443 F.3d 1165 (9th Cir.2006) *reh'g en banc granted,* 462 F.3d 1066 (9th Cir.2006).   Therein, the Ninth Circuit Court stated *en banc:*

> "The court invites supplemental briefs by the parties addressing some or all of the following questions on the role of the United States Sentencing Guidelines in a district court's sentencing decision after United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005):  1. Do we have jurisdiction to review appeals of within-Guidelines range sentences?  2. If we have jurisdiction to review within-Guidelines range sentences, are such sentences entitled to a presumption of reasonableness, or should we review such sentences no differently than we review outside-Guidelines range sentences? If within-Guidelines range sentences are entitled to a presumption of reasonableness, is this presumption conclusive? Rebuttable? If rebuttable, how can such a presumption be rebutted? 3. How should we review a post- *Booker* sentence for reasonableness? Do we review only whether the district court complied with *Booker* 's mandate to consider the 18 U.S.C. § 3553(a) factors? If so, is this review de novo? Do we independently review the sentence imposed for reasonableness? If so, how do we determine whether a sentence is reasonable? What legal and factual matters, if any, must we consider? Is this review for abuse of discretion? Are factual findings decided by the district court reviewed for clear error, abuse of discretion, or on some other standard of review? Does it matter whether the findings are pertinent to the calculation of the advisory Guidelines range or pertinent to the application of the other 18 U.S.C. § 3553(a) factors? 4.

20

What procedure is a district court required to follow in sentencing a defendant within the advisory Guidelines range? In particular, what should be the district court's duty, if any, to articulate its consideration of the section 18 U.S.C. § 3553(a) factors?  5. If distinct from the procedure for within-Guidelines range sentences, what procedure is a district court required to follow in sentencing a defendant above or below the advisory Guidelines range? 6. What weight does the advisory Guidelines range have, in relation to other 18 U.S.C. § 3553(a) factors? In conducting a sentencing proceeding, may a district judge announce that he will impose a sentence within the advisory Guidelines range unless the parties present compelling reasons for imposing a sentence outside of that range? On review, should we determine whether the district court has given the advisory Guidelines range the appropriate weight, and if so, how?"  Briefs were to be filed by September 15, 2006 on this matter." *Id.*

However, On December 6, 2006, the Ninth Circuit issued the following further order of that Court:

"...[T]he US Supreme Court has granted writs of certiorari in *Claiborne v. US*, 75 U.S.L.W. 3243, 3246 (U.S. Nov. 3, 2006) (No. 06-5618) and *Rita v. US*, 75 U.S.L.W. 3243, 3246 (U.S. Nov. 3, 2006) (No. 06-5754). The issues in Claiborne are: 1) Was the district court's choice of below-Guidelines sentence reasonable? 2) In making that determination, is it consistent with Booker to require that a sentence which constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances? The issues in Rita are: 1) Was the district court's choice of within-Guidelines sentence reasonable? 2) In making that determination, is it consistent with Booker to accord a presumption of reasonableness to within-Guidelines sentences? 3) If so, can that presumption justify a sentence imposed without an explicit analysis by the district court of the 18 USC Section 3553(a) factors and any other factors that might justify a lesser

21

sentence? Given overlap of the issues raised, *we vacate submission of Zavala and Carty pending the decisions by the Supreme Court in Claiborne and Rita.* Meanwhile, our 8/23/06 order remains in effect. Accordingly, the panel opinions shall not be cited as precedent by or to this court or any district court in the circuit (footnote 1) footnote: Judge Kozinski would plough forward to a decision and give the Supreme Court the benefit of our thinking, inspired by the exceptionally fine briefing and argument presented by the parties and most amici."

In sum, until the Supreme Court issues rulings in *Claiborne* and *Rita, supra,* Petitioner's appeal is tantamount to no appeal at all.

This effective denial altogether of Petitioner's constitutional right to appellate review further warrants the immediate relief sought by this motion.

## V.   CONCLUSION

For all of the foregoing reasons, and the record in this case, this Honorable Court is respectfully urged to grant the Petitioner's motion to vacate its sentence imposed upon her on January 10, 2005, or, at a minimum, to grant the Petitioner an evidentiary hearing on the instant matter.

///

DATED: June 17, 2007

OLDMAN, COOLEY, SALLUS, GOLD,
BIRNBERG & COLEMAN

By:_____
RON GOLD, Attorneys for Defendants/
Counterclaimants

22