UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

- - - - -

THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

THE UNITED STATES OF AMERICA,      )
                                   )
                                   )
                                   )
                   PLAINTIFF,      )
VS.                                )     CR 04-374(A)-SJO
                                   )
RITA MARIE LAVELLE,                )
                                   )
                   DEFENDANT.      )
                                   )

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, SEPTEMBER 23, 2004

VOLUME III OF V

DEBORAH K. GACKLE, CSR, RPR
Official Court Reporter
U.S. District Court
312 North Spring Street
Room 402-A
Los Angeles, CA  90012
(213) 620-1149

4

```
 1                        I N D E X
 2
     GOVERNMENT'S WITNESSES:   DIRECT   CROSS  REDIRECT   RECROSS
 3
 4      ANNETTE FREIHON          37       86     112        115
 5
     DEFENDANT'S WITNESSES:    DIRECT   CROSS  REDIRECT   RECROSS
 6
 7      JOHN JAROS              123       --     --         --
 8      RITA LAVELLE            126      144    184         --
 9
10                        E X H I B I T S
11   GOVERNMENT'S                                      RECEIVED
12
        44                                                40
13      45                                                40
        56                                                41
14      21                                                45
        59                                                48
15      60                                                49
        73                                                55
16      43                                                65
        17                                                67
17      12                                                68
        13                                                68
18       3                                                70
         2                                                71
19       6                                                74
         8                                                76
20       9                                                76
        14                                                76
21      15                                                76
        20                                                76
22      20A                                               78
        20B                                               78
23      20C                                               78
        20D                                               78
24      20E                                               78
        20F                                               78
25      23                                                79
     //
```

1   with the alternates, and counsel and the parties are also

2   present.  We continue with the government's case in chief.

3          The government at this point, ladies and gentlemen,

4   will be reading into the record certain testimony offered before

5   the grand jury; is that correct?

6          MR. JOHNS:  Correct, Your Honor.

7          THE COURT:  Would you please proceed.

8          MR. JOHNS:  Your Honor, the government would call an

9   intern with our office to the stand, Mark Williams, who will be

10  acting as a reader.

11         He will be reading the part, the testimony of the

12  defendant, Rita Lavelle, for the testimony that she gave before

13  the grand jury on September 10th, 2003, and on October 8, 2003.

14         We will proceed.  I will read the question, and

15  Mr. Williams will read the defendant's answer.

16         THE COURT:  Thank you.

17         MR. JOHNS:  Thank you, Your Honor.

18         "Proceedings had before the grand jury of the United

19  States, and for the Central District of California, at the

20  United States District Courthouse, 13th Floor, 312 North Spring

21  Street, Los Angeles, California, Wednesday, September 10, 2003.

22         The defendant is sworn.

23         And I will begin on page 2, line 8 of the September

24  10th, 2003 transcript.  I will read the question of the

25  foreperson.

11

1        "Will you please have a seat and then state your full

2  name and its correct spelling.

3        "Okay.

4        "And name the organization or agency you represent

5  and/or employer for whom you work.

6        "My name is Rita Marie Lavelle, L-a-v, as in 'Victor,'

7  e-l-l-e.  I work for myself, self-employed.

8        "Thank you.

9        "Your witness."

10       And then Mr. Johns asks the questions.

11       "Thank you, sir."

12  Q.  "Folks, as you know, ordinarily Ms. Kim and I would be up

13  here by -- strike that.  We'll begin with examination.

14       "Ms. Lavelle, is it true that you are here today

15  appearing before this grand jury on a voluntary basis?

16  A.  "Yes, sir.

17  Q.  "You have not been subpoenaed to testify before this grand

18  jury, have you?

19  A.  "No, sir.

20  Q.  "You did receive a subpoena to come today and to give a

21  handwriting exemplar, correct?

22  A.  "Yes, sir.

23  Q.  "But the reason you are now appearing before this grand jury

24  to give testimony is because you feel that you have information,

25  your side of the story, that you would like to present to this

12

1    grand jury, correct?

2    A.   "Yes."

3           THE COURT:   Mr. Johns, would you slow it down just a

4    little bit, please.

5    A.   "And I want the truth to come out.  I want to have a fair

6    hearing.

7    Q.   "Very well.  You have also indicated that you would like to

8    answer questions that I or the other prosecutor, Dorothy Kim,

9    have, correct?

10   A.   "Yes, sir.

11   Q.   "Now, you have finished -- you have completed your

12   handwriting exemplar, correct?

13   A.   "Yes, sir.

14   Q.   "Now, do you understand that you are free to leave at any

15   time?

16   A.   "Yes, sir.

17   Q.   "That you are not being detained here, correct?

18   A.   "No, not yet, no.

19   Q.   "You're not presently in custody?

20   A.   "No.

21   Q.   "I just want you to understand that if at any time you feel

22   uncomfortable, and you wish to terminate the questioning in the

23   proceeding, you are free to get up and to leave.

24          "Do you understand that?

25   A.   "Yes.  I would hope that anybody asks any question they have

13

1    so that we can finally put everything to bed.

2    Q.   "Now, it's important that you understand you remain a target

3    in this grand jury inquiry.

4         "You understand that, correct?

5    A.   "You told me that, yes.

6    Q.   "Now, I'd like to show you an exhibit which is marked Grand

7    Jury Exhibit 30.

8         "THE FOREPERSON:  Excuse me, would it apply that you

9    read her -- her -- the rights, as well as the witness?

10        "MR. JOHNS:  Oh, I will.  This is the subpoena for the

11   handwriting exemplar.  I just want to show it to her.

12        "THE FOREPERSON:  All right.

13   "BY MR. JOHNS:

14   Q.   "I apologize.  It may be difficult to read this, but this is

15   Grand Jury Exhibit 30.  Do you recognize that as the subpoena

16   which required you to come here today and provide a personal

17   handwriting exemplar?

18   A.   "It looks like it.  I couldn't swear to it, but it certainly

19   looks like it, yes.

20   Q.   "Okay.  Thank you.

21   A.   "I note that the return of service wasn't completed.

22   Q.   "Not unless you appear.

23        "Now, if I could have you turn your attention to Grand

24   Jury Exhibit 31.

25   A.   "Okay.

14

1    Q.   "For the record, I would note that this is what we call a

2    'target letter.' The date is September 26th of 2002, correct?

3    A.   "That's correct.

4    Q.   "Now, it's my understanding that, though I caused this

5    letter to be mailed on that date to the address in the upper

6    left-hand corner, you never received this target letter,

7    correct?

8    A.   "I never received it.  That's correct.

9    Q.   "However, your business partner, Kent Thedaker, did receive

10   the target letter dated September 26, 2002?

11   A.   "In the mail.  I subsequently did get a copy, but I never

12   received one in the mail.

13   Q.   "Very well.  You did receive a target letter from me by hand

14   delivery?

15   A.   "By hand, when we met, yes.

16   Q.   "And Mr. Thedaker did, in fact, discuss his September 26,

17   2002 target letter with you, didn't he?

18   A.   "Yes.  He showed it to me, and we discussed it.

19   Q.   "Now I'd like to turn your attention to an exhibit which is

20   marked Grand Jury Exhibit 32.  Do you recognize that exhibit,

21   and if so, could you tell the members of the grand jury what it

22   is?

23   A.   "Yes.  Exhibit 32 is a letter from me to you, Joe Johns,

24   discussing this letter of the 26th and saying that I had not

25   received it.  That I had called your office four times, and that

15

1    you hadn't returned a phone call yet.

2          "And that I would like to meet in order to correct any

3    miscommunication, misinterpretation or missing facts.  That I

4    took this very seriously, and I basically asked for a meeting at

5    your earliest convenience.

6    Q.   "In fact, I did agree to meet with you along with --

7    A.   "Yes, sir, you did.

8    Q.   "And at that time, Special Agent Annette Freihon of the FBI

9    was present, correct?

10   A.   "I believe so.

11   Q.   "And the date of this letter is October 5th, 2002?

12   A.   "Yes, sir.

13   Q.   "Turning your attention to an exhibit which is marked Grand

14   Jury Exhibit 33, this is a letter from me to you, dated October

15   7th, 2002.  Is this the target letter that you ultimately did

16   receive from me?

17   A.   "No.  My recollection of it, Joe, was that you presented me

18   with a copy of the 'target letter,' quote, unquote, when we met.

19   So I didn't think this was the target letter.

20   Q.   "So you don't recall receiving --

21   A.   "I recall receiving this, but it wouldn't be the, quote,

22   unquote, 'target letter' that you talked about.

23          "This was basically saying that you would be able to

24   meet with me, and I think you said available next week,

25   October 17th at 1:00 p.m.

16

1   Q.   "You know what, you're absolutely correct.   This isn't the

2   target letter.

3   A.   "Right.

4   Q.   "Thank you.

5        "Let me refer back to Exhibit 31, which is the

6   September 26th, 2002 target letter.

7   A.   "Yes, sir.

8   Q.   "Now, you received a copy of this delivered by hand on

9   October 17th?

10  A.   "When we met, and I believe it was October 17.

11  Q.   "This letter informed you that you are a target of a grand

12  jury investigation into allegations concerning a conspiracy to

13  commit both mail fraud and bank fraud, correct?

14  A.   "Yes.   Excuse me.   That is what it says.

15  Q.   "The information developed to date suggests that you, Kent

16  Thedaker, and your business, Nutech, Incorporated, that's

17  N-u-t-e-c-h, along with other individuals, conspired

18  fraudulently and obtained funds from Capital Partners,

19  Incorporated and its bank by falsely invoicing Joseph Bertelli

20  and the LEMCO, Incorporated for environmental compliance work

21  which was never performed, in violation of Title 18, United

22  States Code, Section 371, that's conspiracy, 1341, that would be

23  mail fraud, and 1344, which is bank fraud.

24       "Evidence further indicates that you,

25  Mr. Thedaker, and your business, Nutech, Incorporated,

17

1    along with other individuals, illegally transported

2    hazardous waste to Denova, Incorporated without a

3    manifest, in violation of Title -- it should be 42,

4    not 142, spell check didn't catch that, United States

5    Code, Section 6928(d)2.

6              "Do you remember reading that?

7    A.   "I remember reading that, yes, October 17th, when you gave

8    me a copy.

9    Q.   "Thank you.

10             "Now, as you sit here today, based on everything that

11   has gone on to this point, including your October 17th meeting

12   and discussion with Agent Freihon and myself, do you feel that

13   you have a general understanding of the nature of the

14   allegations against you?

15   A.   "Not really.  I specifically still don't understand what

16   you're charging me with and on the basis of what.  I mean, it's

17   been very nebulous, and there's no -- there's been no details.

18             "And that is why I'm here, to simply find out and

19   answer any questions that anyone may have because I've done

20   nothing improper and nothing illegal.

21   Q.   "I understand you're not aware of the specific details, but

22   do you have a general understanding that you are a target, along

23   with other individuals, of a mail fraud and bank fraud

24   investigation having to do with a factoring company, Capital

25   Partners, and an invoice from the LEMCO business operated by

18

```
 1 │ Mr. Bertelli?
 2 │        "Is that a fair --
 3 │ A.   "Invoice from Bertelli's company?
 4 │ Q.   "An invoice associated with Mr. Bertelli's company.
 5 │ A.   "No, that's not my understanding.  My understanding, as only
 6 │ verbally communicated to me by Mr. Bertelli and some other
 7 │ people that you have spoken with, is that you think that there
 8 │ might be some mail fraud or bank fraud, I don't know what bank.
 9 │        "The mail fraud is supposed to be a Denova
10 │ Environmental invoice, false invoice, to Joe Bertelli and myself
11 │ at Nutech for work that was never completed.  That's my
12 │ understanding of what you're alleging.
13 │ Q.   "Fair enough.
14 │        "But you are aware that you are at least a target at
15 │ this point in time?
16 │ A.   "A target of whatever you think you've got, that is why I'm
17 │ here.
18 │ Q.   "In spite of that, do you still wish to appear here today
19 │ and to address this grand jury?
20 │ A.   "Oh, yes.
21 │ Q.   "Do you understand that this is a very unusual step for a
22 │ target of grand jury inquiry to take?
23 │ A.   "It's a very unusual step for the environmental unit or the
24 │ Justice Department to come up with bank and mail fraud against
25 │ me.
```

19

1     "I want to be here, and I thank you for taking the time

2     to allow me to answer all these questions because I've done

3     nothing wrong.  And I cannot afford an attorney, and I cannot

4     afford this disruption in my life, once again, for something I

5     did not do -- that what was wrong.

6          "I mean, I just can't stand back and take this.  This

7     was a year ago you met with me, and I've had no details since

8     except, all of a sudden, now I have to appear before a grand

9     jury because I'm a target now.

10    Q.   "Understood.

11         "I'm just telling you that in my experience, it's very

12    rare for a target to willingly appear in front of a grand jury.

13         "Do you understand that?

14    A.   "Well, I understand that is your experience.  That is what

15    you say, yes.

16    Q.   "And despite that, you still wish to --

17    A.   "Yes.  And I'm very grateful for your willingness to let me

18    answer any questions you might have, and for you to ask the

19    questions in front of a grand jury.  Thank you, Joe.

20    Q.   "Now, you've alluded to attorney representation.  Let me ask

21    you some questions regarding that.

22    A.   "Okay.

23    Q.   "You have certain rights as a witness before this grand jury

24    which I'm about to explain to you.  First, you have the right

25    under the Sixth Amendment to advice of counsel; that is, you may

1  be represented by an attorney.

2          "Your attorney, if you have one, cannot be in the grand

3  jury room with you, but you may at any time advise the

4  foreperson of the grand jury that you wish to consult with your

5  attorney.  You may then leave the grand jury room, consult with

6  your attorney, and return.

7          "Do you understand that right?

8  A.   "Yes, sir.

9  Q.   "Do you have an attorney?

10 A.   "No, sir.

11 Q.   "Have you been represented by an attorney in this matter, in

12 these allegations at any point?

13 A.   "Never.

14 Q.   "Do you have any questions concerning your right to advice

15 of counsel?

16 A.   "No.  You've explained it quite well.

17 Q.   "Now, you mentioned that you could not afford an attorney.

18 A.   "That's correct.

19 Q.   "Do you wish to retain an attorney or do you wish to have an

20 attorney appointed to represent you before you proceed here

21 today?

22 A.   "No.

23 Q.   "Do you understand that we could take a break in these

24 proceedings, and I could provide you with a phone number for the

25 federal public defender's office, and you could contact them and

21

1    see if they will accept this case?

2           "Do you understand that?

3    A.   "I understand that, yes.

4    Q.   "Now, if they decide that they cannot accept this case for

5    whatever reason, we then could provide you with a financial

6    affidavit which you could then fill out and submit to the

7    federal court, review by a district court judge, who may decide

8    that you qualify for an indigent panel attorney, what they call

9    a 'panel attorney.'

10          "Do you understand that?

11   A.   "I understand that.

12   Q.   "Knowing that it is possible for you to have an attorney

13   appointed for you, would you like to take a break in these

14   proceedings to seek that opportunity?

15   A.   "No, sir.

16   Q.   "It's your intention to proceed today without an attorney?

17   A.   "Yes, sir.

18   Q.   "Secondly, you have the Fifth Amendment right to refuse to

19   answer any question asked of you if you honestly and truly

20   believe the answer may tend to incriminate you.

21          "An answer may tend to incriminate you if it can

22   provide or lead to information concerning the crime for which

23   you can be prosecuted.

24          "Do you understand that right?

25   A.   "Yes, sir.

22

1    Q.   "Do you understand that anything you say can be used against

2    you?

3    A.   "Yes, sir.

4    Q.   "Have any promises or threats been made by the government,

5    either directly by its agents or attorneys or indirectly through

6    anyone else?

7    A.   "Promises or threats?

8    Q.   "Have you been promised or threatened in any way, indirectly

9    by the government or directly by the government or its agents,

10   which has caused you or has compelled you to appear here today

11   to testify?

12   A.   "Only surrounding this case, right?

13   Q.   "Correct.

14   A.   "The only promise has been that I will be allowed to explain

15   and answer all questions, and that is what I was hoping for.  So

16   thank you.

17   Q.   "Fair enough.

18        "Now, in addition to the rights you have as a witness,

19   you also have an obligation.  That obligation is to answer any

20   questions put to you forthrightly and truthfully, because you

21   are under an oath before this grand jury and are subject to

22   penalties for perjury and false declaration before a grand jury

23   or court.

24        "Do you understand that?

25   A.   "Yes, sir.

23

1    Q.   "Do you understand perjury is the making of a statement that

2    you know to be materially false?

3    A.   "Materially false, yes, sir.

4    Q.   "Do you understand that you could be subject to a fine of up

5    to $250,000 and imprisonment for up to five years if you commit

6    perjury?

7    A.   "Yes, sir.

8    Q.   "Do you have any questions about anything I have said so

9    far?

10   A.   "No, none.   Thank you again for allowing me to be here.

11   Q.   "Counsel would like me to inform you that if at any point

12   today while you are making your presentation to this grand jury,

13   or at any time while Ms. Kim and I are asking you questions, if

14   you change your mind with regard to the attorney issue, and you

15   would like to seek the advice of an attorney, perhaps seek the

16   appointment of an attorney, just let us know, and we will take a

17   break and allow you to do that.

18   A.   "That is very fair.   Thank you.

19   Q.   "Well, that concludes our introduction.

20        "Ms. Lavelle, I turn the floor over to you and would

21   ask you what information or documents would you like to present

22   to the grand jury, and with that, I will turn the microphone

23   over to you.

24   A.   "Thank you again for allowing me to come in and explain what

25   I think you think I possibly did wrong or clarify what you think

1    shipment."

2              MR. JOHNS:  That is enough.  Turning to -- strike that.

3    It continues.  Go ahead.

4    A.   "And I also remember them sending me a purchase order as

5    part of this transaction to approve on Joe's behalf that indeed

6    this work would be completed, and this was the amount of money

7    that would be paid by Joe for the cleanup of the drums.

8    Q.   "I'd like to show an exhibit which is marked No. 5 for

9    identification.

10   A.   "Okay.

11   Q.   "I'll ask you if you recognize it.

12   A.   "Ah, this is a purchase order.  Vendor is LEMCO.  It's a

13   purchase order to Denova.

14   Q.   "Do you recognize this particular purchase order?

15   A.   "I think this is the one that I approved on their behalf.

16   Q.   "Now, when you say 'approved' it, what does that mean you

17   did?

18   A.   "I believe that I'm the one that signed Joe Bertelli's name

19   at the bottom.

20   Q.   "So in the lower left-hand corner, that is your handwriting

21   signing 'J. Bertelli'?

22   A.   "For Joe Bertelli, that is my handwriting, I think, for Joe.

23   Q.   "So then I take it that Denova prepared this purchase order,

24   and you then reviewed it and approved it by affixing

25   Mr. Bertelli's name to it, correct?

33

1       MR. JOHNS:  Page 55, please.  Would you begin with the

2   answer on line 1.

3   A.   "It possibly was.  Whoever signed these is the same person.

4   So it may have been me, yes.

5   Q.   "So you would agree that --

6   A.   "I completed all the rest of it.  So maybe I did sign it.  I

7   don't know.

8   Q.   "Well, I'm asking you.

9   A.   "I may have, yes.  I completed all the rest of it.  I

10  completed the address beneath the signature.  So maybe I did

11  sign it, yes.

12  Q.   "Maybe you did sign it?

13  A.   "Maybe I did, yes.  Hello, I already said I signed lots of

14  things for him.

15  Q.   "Please take a look at the next document in order in Grand

16  Jury Exhibit 35.  It is entitled 'Security Agreement' at the

17  top."

18       MR. JOHNS:  Your Honor, I'm now publishing to the jury

19  Government Exhibit 84, which is in evidence, and at that time

20  was marked Grand Jury Exhibit 35.  I'm turning to the page

21  entitled "Security Agreement."

22  Q.   "Do you recognize this document?

23  A.   "Yeah.  I don't recognize it immediately, but, I mean, this

24  is probably a document that I reviewed at the time.

25  Q.   "Do you know what the purpose of this document is?

34

1  A.  "When the work's completed, that Denova will be paid.

2  Q.  "Well, that is not what this security agreement says, is

3  it?"

4        MR. JOHNS:  Turn to page 62, please.  Beginning at

5  line 3, question.

6  Q.  "Well, let's take a look at the signature on the security

7  agreement which you just testified is, in fact, your signature.

8  A.  "I think I signed all of these.

9  Q.  "I'm going to place it right next -- I'm going to place it

10 right next to it, and you tell me what the difference between

11 these two signatures is?

12 A.  "It looks to be the same.

13 Q.  "Okay.  Would you agree with me that all the signatures we

14 have looked at thus far are, in fact, your handwriting?

15 A.  "Yes, I think they are.

16 Q.  "Okay.  Please take a look at the next document in order,

17 which is a check, a LEMCO Corporation check, correct?

18 A.  "That's correct.

19 Q.  "Now, you included this check in the documents you submitted

20 to Capital Partners so that they would know his bank account

21 number, correct?

22 A.  "I assume that is the one that was in there, yeah, because I

23 think they only wrote us one check."

24        MR. JOHNS:  Turn to page 82.  Begin with the answer on

25 line 6.

44

```
 1   A.   I went down to her house to find her.

 2   Q.   And did you meet with her at her house?

 3   A.   No.   We met at a coffee shop.

 4   Q.   And who suggested the place for the meeting?

 5   A.   Ms. Lavelle.

 6   Q.   Now, did you tell her during this meeting that she was the

 7   target of investigation?

 8   A.   No, I didn't.

 9   Q.   What did you tell her about the circumstances under which

10   you had contacted her?

11   A.   I told her that I found these documents at Denova during the

12   course of the search warrant, and I wanted to ask her some

13   questions about them.

14   Q.   Did you explain to the defendant what the search warrant was

15   about?

16   A.   Yes.

17   Q.   Meaning the capacity issue?

18   A.   Yes.

19   Q.   Did you show her documents that bore Joe Bertelli,

20   Mr. Bertelli's purported signature?

21   A.   Yes, I did.

22   Q.   Can you please look at Government's Exhibit 21.

23   A.   Okay.

24   Q.   Do you recognize that exhibit?

25   A.   I do.
```

45

1   Q.   What is that exhibit?

2   A.   It's actually a cover sheet of the fax to Bob Cole from Rita

3   Lavelle, and attached to that is a fax to Annette

4   Rankin(phonetic) from Rita Lavelle, and attached to that is a

5   letter from Ms. Lavelle to Sean Walden, dated August 28th, 2000.

6   Q.   Where did you find Exhibit 21?

7   A.   In the Denova file.

8   Q.   How do you know that?

9   A.   There is a "D" on the back.

10          MS. KIM:   Your Honor, the government offers Exhibit 21

11   into evidence.

12          MR. CEPHAS:   No objection.

13          THE COURT:   Exhibit is received.

14          (Government's Exhibit 21 received in evidence.)

15          MS. KIM:   May I publish, Your Honor?

16          THE COURT:   Please.

17   BY MS. KIM:

18   Q.   Special Agent Freihon, have you had an opportunity to

19   compare the documents that are attached to Exhibit 21 to

20   Exhibit 19?

21   A.   Yes.

22   Q.   Do they appear to be the same documents?

23   A.   Yes, with the exception of the fax cover sheets.

24          MS. KIM:   For the record, I've placed on the Elmo

25   page 5 of Exhibit 21, the credit application.

1   Q.   Special Agent Freihon, what, if anything, did the defendant

2   say about the signature, "J. Bertelli," that appears on the

3   credit application?

4   A.   She said that she may have signed it.

5   Q.   If I can draw your attention to the continuing guarantee and

6   waiver that is part of Exhibit 21.

7            Draw your attention to the handwriting portions of it,

8   to include purchase order, August 25th, 2000, and then 14532

9   Wilson Street, Midway City, 92625, or care of Nutech, 4749

10  Oceanside Boulevard, Oceanside, California.

11           Now, what, if anything, did the defendant say about the

12  handwriting that appeared on the continuing guarantee and

13  waiver?

14  A.   She said that was her handwriting.

15  Q.   What, if anything, did she say about the signature that

16  appeared on the continuing guarantee and waiver?

17  A.   She said that was in her handwriting, as well.

18  Q.   Did she admit to the handwritten portions being her

19  handwriting before or after she admitted to the signature being

20  her handwriting?

21  A.   Before.

22  Q.   Finally, if I can draw your attention to the last page of

23  Government's Exhibit 21 -- Exhibit 21, the purchase order.

24           What, if anything, did she say about the signature,

25  "J. Bertelli," that appears at the bottom left-hand corner of

1   the purchase order?

2   A.   She said that she had signed it.

3   Q.   Could you please clarify for the record whether the

4   defendant admitted that she had signed it or had not signed it?

5   A.   She had signed it.

6   Q.   What, if anything, did the defendant say about her financial

7   situation during August of 2000?

8   A.   She said at the time she was in serious financial straits.

9   Q.   What, if anything, did she say about the reason for her

10   being in financial straits?

11   A.   She told me that she was involved in a big civil lawsuit and

12   that she had suffered over a million dollar loss as a result of

13   that.

14   Q.   Now, if I can draw -- strike that.

15          During this conversation on February 7th, 2001, did you

16   have conversations about the search warrant at Denova?

17   A.   Yes.

18   Q.   What, if anything, did the defendant say about Denova's over

19   capacity problems?

20   A.   She indicated to me that the place was always over capacity,

21   that it had continuing capacity problems.  In fact, that she had

22   consulted and advised them on previous occasions when they had

23   been cited by DTSC.

24   Q.   Did the defendant provide you with any documents regarding

25   the capacity problems?

52

1   on them?

2   A.   It places the amount that they can store at any one time.

3   Q.   Did you discuss the LEMCO factoring deal with the defendant?

4   A.   Yes.

5   Q.   What, if anything, did she say about her obtaining money

6   from Capital Partners?

7   A.   She said that she had received a check from Capital

8   Partners.

9   Q.   Why did she receive that check?

10  A.   She said it was some money that Denova owed her, a payment.

11  Q.   What, if anything, did she say about her knowledge of the

12  source of the money that she received from Capital Partners?

13  A.   She said she had no idea what had been factored to produce

14  that check.

15  Q.   Factored to by whom?

16  A.   Capital Partners.

17  Q.   What, if anything, did she say about an invoice from Denova

18  to Bertelli, to Mr. Bertelli?

19  A.   She said she believed that invoice was the result of a bid

20  that Denova had made to dispose of 60 to 80 drums of waste from

21  LEMCO, and that they had turned that bid into an invoice and

22  submitted it to Mr. Bertelli.

23  Q.   Who is "they"?

24  A.   Denova and Bob Cole and Gene Van Houten, most likely.

25  Q.   But you believe she was referring to Denova?

1    A.   Yes.

2    Q.   What, if anything, did she say about when she had first seen

3    the invoice?

4    A.   She said she first saw it after Mr. Bertelli contacted her

5    and asked her what it was all about.

6    Q.   What, if anything, did she say about her knowledge of any

7    fraud?

8    A.   Well, she said she believed that Denova may have acted

9    fraudulently in turning this bid into an invoice and sending it

10   off, and that she believed Capital Partners had been defrauded

11   in the process.

12   Q.   What, if anything, did she say about the timing in which she

13   understood Capital Partners may have been defrauded in the

14   process?

15   A.   After she received notification from Mr. Bertelli about the

16   bill he got from them.

17   Q.   Did the defendant provide a written statement, as well?

18   A.   She did.

19   Q.   When did the defendant provide the written statement?

20   A.   After we spoke, I asked her to produce a statement, if she

21   would.

22   Q.   Where did she produce the statement?

23   A.   She did it out in the waiting area, out in front of

24   Mr. Johns' office.

25   Q.   Did she agree to do the statement?

59

1  Q.  Can you then read the handwriting that appears at the top

2  margin of page 7.

3  A.  "I never gave Capital Partners any documents until after the

4  problem emerged."

5  Q.  And what is that "R" on the right?

6  A.  That is her initial.

7  Q.  You mean by "her" --

8  A.  I'm sorry, Ms. Lavelle.

9  Q.  What was the context in which the defendant wrote this

10 statement, "I never gave Capital Partners any documents until

11 after the problem emerged"?

12 A.  I was asking her what her correspondence was with Capital

13 Partners in light of this check that she received from Denova

14 and this problem with Mr. Bertelli and the alleged false

15 invoice.

16 Q.  What was her response?

17 A.  So her response was, in terms of her correspondence with

18 them, that she had never given them any actual documents until

19 after she found out through Mr. Bertelli that there was a

20 problem.

21 Q.  Then she wrote the statement?

22 A.  Yes.

23 Q.  Can you please read to the members of the jury the

24 handwriting on the bottom left corner.

25 A.  "I would sign 'Joe Bertelli' and then my initials."

1    a call from Mr. Bertelli that he had an invoice for some $50,000

2    from a company called Capital Partners.  I asked him to forward

3    it to me, and go back to chemo.

4          "Mr. Bertelli was in and out of the hospital at this

5    time, and I was handling his LEMCO mess to relieve the pressure

6    from him and his family."

7    Q.   If you can continue on to the second paragraph.

8    A.   "When I got the invoice package, I realized that Capital

9    Partners was invoicing for Denova for removal of the 60 to 80

10   drums of waste.

11         "I knew that Denova had never done this work, but

12   remembered their submission of a written bid to Nutech which I

13   had included in our written correspondence and work plan

14   submission to EPA, et al."

15   Q.   Special Agent Freihon, did there come a time when you

16   obtained documents from defendant's files?

17   A.   Yes.

18   Q.   When was that?

19   A.   It was February 16th, 2001.

20   Q.   To be clear, that was before the declaration was written by

21   the defendant?

22   A.   Yes.

23   Q.   Now, how was it that you came to receive these documents?

24   A.   I served her with a grand jury subpoena for records.

25   Q.   Was she cooperative?

1   A.   Yes.

2   Q.   Did she give you documents regarding Denova?

3   A.   She did, an entire boxful.

4   Q.   Did she give you documents regarding LEMCO?

5   A.   Not initially, but she did.

6   Q.   What do you mean by "Not initially, but she did"?

7   A.   The box with the Denova documents she had -- kind of had

8   prepared for me to take, and the LEMCO documents were not

9   prepared, and I had to tell her that the subpoena required her

10  to produce the LEMCO documents.

11  Q.   But she did eventually give you the LEMCO --

12  A.   She showed me where they were in the filing cabinets, and

13  she allowed me to take them.

14  Q.   Now, have you looked through the LEMCO documents?

15  A.   I have.

16  Q.   Can you please explain to members of the jury how those

17  documents were kept.

18  A.   She had them mostly in purple file folders, so they were

19  easily identified, most of them, and she had them segregated in

20  different ways.

21       Like there was one file folder that simply said "LEMCO

22  Factor," there was one that said "LEMCO Brownfields Working

23  File," there was one for contacts, there was one for

24  correspondence with the L.A. County Fire Department, and one for

25  bills and various other things.

64

1   Q.   If I can refer back to Exhibit 73, paragraph 2.

2        In your review of these documents, these LEMCO

3   documents, did you find a document that enabled Lavelle/Nutech

4   to complete certain loan applications on behalf of Joe Bertelli?

5   A.   Yes.

6   Q.   Did you find any filled-in loan applications?

7   A.   No.

8   Q.   Now, I believe, Special Agent Freihon, you testified there

9   was a file entitled "Brownfields"?

10  A.   Yes.

11  Q.   What, if anything, was in the Brownfields loan

12  application -- I'm sorry -- the loan file, the Brownfields file?

13  Excuse me.

14  A.   There were some handwritten notes by Ms. Lavelle in her

15  handwriting.   There was a -- it looked like a magazine article

16  that had been sent to her by Mr. Bertelli.

17          A few business cards, and some little bills or invoices

18  for some unrelated items.   Oh, I'm sorry, and also some fact

19  sheets from EPA on Brownfields.

20  Q.   What do you mean by "fact sheets from EPA"?

21  A.   They're publications by EPA just talking about the

22  Brownfields situation.

23  Q.   If I can keep your attention on the LEMCO files.   Did you

24  see documents regarding the Capital Partners' factoring of the

25  purchase order?

65

1    A.   In a separate file.

2    Q.   Moving back, I'm sorry.  Did you find any bids that had been

3    submitted by Denova?

4    A.   No.

5    Q.   If we can go back on to Capital Partners, can you please now

6    look at Government's Exhibit 43.

7    A.   Okay.

8    Q.   Do you recognize that exhibit?

9    A.   Yes.

10   Q.   What is that exhibit?

11   A.   It's a fax from Bob Cole to Rita Lavelle.

12   Q.   And where did you obtain Exhibit 43?

13   A.   I got that from Ms. Lavelle's files.

14   Q.   How do you know that?

15   A.   Because I took this item out of her -- the box that I had

16   her files in, and I wrote an "L" on the back.

17   Q.   And when did you did that?

18   A.   A few days ago when we prepared these exhibits.

19          MS. KIM:   Your Honor, the government offers Exhibit 43

20   into evidence.

21          MR. CEPHAS:   No objection.

22          THE COURT:   Forty-three is received.

23          (Government's Exhibit 43 received in evidence.)

24   BY MS. KIM:

25   Q.   Is that Exhibit 43?

1   A.   Yes.

2              THE COURT:   I'm curious how much additional of this

3   witness do you have?

4              MS. KIM:   Actually quite a few exhibits to bring in

5   through this witness, although I'll try and move quickly, Your

6   Honor.   Some I will describe, and then later I'll move quickly.

7              May I continue, Your Honor?

8              THE COURT:   Please.

9   BY MS. KIM:

10   Q.   Can you please read this memo to the members of the jury and

11   explain who it is from and to.

12   A.   "To Rita, from Bob Cole."   It says, "Saturday, LEMCO" --

13   "Re:   LEMCO Factoring.   Help, I suspect the Capital Partners

14   will take LEMCO monies from our incoming receivables this week

15   if Joseph doesn't pay.

16              "Of course, I will demand they draw from his account as

17   authorized.   I haven't seen or heard of your communications with

18   Sean Walden.   I must know status ASAP.   Please let me know.

19   Thanks, Bob."

20   Q.   Do you see a fax line on that?

21   A.   Yes.

22   Q.   What is the date?

23   A.   10-7 -- October 7, 2000.

24   Q.   Can you please look at Government's Exhibit 17.

25              To be clear, you have the originals and I have the

67

1    copies, correct?

2    A.   That's correct.

3    Q.   Do you recognize that exhibit?

4    A.   Yes.

5    Q.   What is that exhibit?

6    A.   It's a purchase order from Denova to LEMCO.

7    Q.   Where did you obtain this exhibit?

8    A.   From Ms. Lavelle's files.

9    Q.   How do you know that?

10   A.   There is an "L" on the back.

11           MS. KIM:   Your Honor, the government offers Exhibit 17

12   into evidence.

13           MR. CEPHAS:   No objection.

14           THE COURT:   Seventeen is received.

15           (Government's Exhibit 17 received in evidence.)

16           MS. KIM:   May I publish, Your Honor?

17           THE COURT:   Yes.

18   BY MS. KIM:

19   Q.   This purchase order does not have the signature

20   "J. Bertelli," correct?

21   A.   That's correct.

22   Q.   Special Agent Freihon, can you hold up your original to the

23   light, if you can?

24   A.   Yes.

25   Q.   What, if anything, do you see on the original of

1       THE WITNESS:  Thank you.

2       MR. JOHNS:  Your Honor, at this point in time, the

3  government has no further witness evidence or witnesses to call.

4  So the government would rest.

5       THE COURT:  Subject to reviewing the exhibits to

6  determine if all of the exhibits referenced in the course of the

7  trial have been received?

8       MR. JOHNS:  Yes, sir.

9       THE COURT:  Thank you.

10       MR. CEPHAS:  May we have a sidebar, Your Honor?

11       THE COURT:  Certainly.  With the reporter, please.

12       (Conference held at the sidebar:)

13       THE COURT:  May help if we move closer to the reporter.

14       MR. CEPHAS:  Your Honor, at this time, the defense

15  would like to make a Rule 29 motion with respect to all three

16  counts, and I'll start with the two false statement counts.

17       Under the law, to be a material false statement, the

18  statement had to have had an effect on the agent, had to have --

19  like influenced her in her investigation.

20       The agent just testified that when my client made the

21  statement, she knew it was false.  She had reviewed all the

22  documents, she knew that my client had sent several documents in

23  August.

24       One, "the problem started" is vague and ambiguous.  As

25  a matter of law, no jury could conclude that there is a false

1   statement by using a term "problem" when the agent herself has
2   said that my client had a serious financial problem in August of
3   2000.
4        Nowhere in the false statement -- the alleged false
5   statement does it say that the problem refers specifically to
6   some time in November or some time when Mr. Bertelli got an
7   invoice.
8        So we have the government with a vague and ambiguous
9   statement trying to bring a false statement claim when the agent
10  wasn't fooled by the statement, she wasn't affected by the
11  statement, by her own testimony.  So as a matter of law, that
12  can't be a false statement.
13       And the same goes for the next count, when my client
14  was supposedly asked which accounts receivable was factored to.
15  Well, an accounts receivable was not factored to my client.
16       My client said, "I don't know."  My client said what
17  was factored to that was an invoice, and identified -- tried
18  to -- the invoice.
19       And the agent testified on the stand that she believed
20  my client was referring to the invoice that started out as a
21  purchase order.
22       So my client, in writing, on that same day she
23  supposedly said, "I don't know" as a false statement said it was
24  the invoice that was factored.  That cannot be false as a matter
25  of law.  This should not go to the jury on those two counts.

121

```
 1            The first count, the wire fraud count, I don't believe
 2     the government has made their case at all in that one either.
 3            I will just say that I believe all three counts should
 4     be dismissed pursuant to Rule 29 at this time.
 5            THE COURT:  Thank you.
 6            Who will argue the motion for the government?
 7            MS. KIM:  As to Counts Two and Three, the case law is
 8     clear.  The false statement need not actually affect the federal
 9     agency's decisions or action, only that they can have evidence
10     from Special Agent Freihon that she is an agent of the FBI
11     charged with investigating federal crimes.
12            Materiality is not a subjective factor but an objective
13     one.  So the motion should fail for Counts Two and Three.
14            As to Count One, the government submits it's sufficient
15     evidence as to all counts of wire fraud for this to go to the
16     jury.
17            THE COURT:  Any response?
18            MR. CEPHAS:  Your Honor, I think the court has to also
19     remember that the statements made by my client were made to the
20     best of her recollection.  The agent testified that she had all
21     the documents, she had all my client's originals.
22            This meeting occurred two years and two months after
23     the events at issue took place here, and she knew my client
24     said, "These are to the best of my recollection."
25            She had all my client's records.  She testified -- she
```

177

1    A.   "Attached please find the following documents which were

2    signed by Mr. Bertelli on Saturday."

3    Q.   That statement is false, isn't it?

4    A.   No.

5    Q.   Mr. Bertelli, Mr. Joseph V, as in "Victor," Bertelli did not

6    sign the documents which are attached to this letter, did he?

7    A.   I can't recall that.

8    Q.   Ma'am, Mr. Bertelli did not sign the continuing guarantee

9    and waiver, which, for the record, is shown on the monitor, did

10   he?

11   A.   I don't know that for sure.

12   Q.   That is your signature there, isn't it, "J. Bertelli"?

13   A.   I don't know for sure.

14   Q.   You admitted in front of the grand jury that that was your

15   signature, didn't you?

16   A.   No.   I admitted that it could be my signature.

17   Q.   You admitted that this was your handwriting, the "14532

18   Wilson Street, Midway City, 92625," didn't you?

19   A.   Yes, I stated I prepared it.

20   Q.   That is your handwriting, isn't it, ma'am?

21   A.   Where?   What?

22   Q.   The information below the signature --

23   A.   Yes, I prepared it.

24   Q.   Is it your testimony, ma'am, that Joseph Bertelli signed

25   this document?

1   A.   That is what I recall.   I went up there on a Saturday, and

2   either he physically signed it or he told me to sign it, but I

3   remember reviewing it with him, along with several other

4   documents at the same time.

5   Q.   Please take a look at the document next in order, which is

6   the credit application, bank information release.

7   A.   All right.

8   Q.   Now, the signature in the lower left-hand corner, that is

9   your signature.   You signed J. Bertelli's name to that, didn't

10  you?

11  A.   I don't know if it's mine or Joe's.

12  Q.   What did you tell the grand jury about that one?

13  A.   I believe I said just what I said because that is the truth.

14  I don't know if it's mine or Joe's.

15  Q.   Take a look at the next document in order.   Now, this is the

16  LEMCO check that you attached so that Mr. Walden would know

17  where and which bank account Mr. Bertelli's money was in, right?

18  A.   That is not the next item.

19  Q.   Can you find it?

20  A.   I can find that, yes.

21  Q.   That is the check you attached, correct?

22  A.   I believe I attached a copy of this check, yes.

23  Q.   Right.   And the purpose for that was so that Sean Walden

24  would have the bank account number for Mr. Bertelli's bank

25  account, correct?

1    correct?

2    A.   He paid Nutech a retainer fee, yes.

3    Q.   He signed this check in your presence, didn't he?

4    A.   Yes, because I refused to sign checks for him.

5         THE COURT:   Please slow it down.

6    BY MR. JOHNS:

7    Q.   Let me ask you one more time:   Is that Mr. Bertelli's

8    signature on the check?

9    A.   As I remember it, he signed the checks, yes.

10   Q.   And does that signature look anything like the signatures on

11   the other documents attached to Exhibit 20?

12   A.   I don't know.   I guess not.   It's four months later.   I

13   don't know.

14        MR. JOHNS:   In light of the court's earlier comments, I

15   will terminate my cross now.

16        THE COURT:   Thank you.

17        Redirect?

18        MR. CEPHAS:   Thank you, Your Honor.

19                      REDIRECT EXAMINATION

20   BY MR. CEPHAS:

21   Q.   Showing you what's been marked as Government's Exhibit 19,

22   which you were just shown, the August 28th letter.

23   A.   Yes, sir.

24   Q.   And there is a statement in the middle with a check next to

25   it saying, "Denova purchase order for the project."

1        Do you see that?

2    A.   Yes, sir.

3    Q.   And to your recollection, is that the purchase order that

4    you believe was factored in this case?

5    A.   Yes, sir.

6    Q.   Now, when Mr. Bertelli hired you, he was in pretty bad

7    health?

8    A.   Yes, sir.

9    Q.   Do you remember every letter you wrote in the year 2000?

10   A.   Heavens, no.

11   Q.   Do you remember every letter you signed in the year 2000?

12   A.   No, sir.

13   Q.   Okay.  Because of Mr. Bertelli's health, sometimes you had

14   to sign for him; is that correct?

15   A.   That is correct.

16   Q.   And I think you testified you remember showing him documents

17   sometimes you signed, sometimes he signed?

18   A.   That's correct.

19   Q.   Can you remember each time that you signed one versus each

20   time he signed?

21   A.   No.  I'm sorry.  I cannot.

22   Q.   And you consistently told that to Mr. Johns, both today, and

23   in the front of the grand jury, and in his office?

24   A.   Yes, I did.

25   Q.   You've always made it clear that sometimes you signed and

1    sometimes Bertelli signed?

2    A.   That is correct.

3    Q.   Now, he asked you about someone named John Copeland Lind.

4    A.   Yes.

5    Q.   You said you remembered a John Lind?

6    A.   John Lind, yeah.

7    Q.   Did you ever do any work for John Lind?

8    A.   I may have.   I can't remember for sure, though.

9    Q.   Did you ever talk to John Lind?

10   A.   Yes.

11   Q.   Did you ever have John Lind's phone number?

12   A.   Yes.

13          MR. CEPHAS:   No further questions.

14          THE COURT:   Recross?

15          MR. JOHNS:   No, sir.

16          THE COURT:   Thank you for your testimony.   You may

17   return to counsel table.

18          Additional witnesses?

19          MR. CEPHAS:   Your Honor, the defense rests.

20          THE COURT:   Subject to review of the exhibits?

21          MR. CEPHAS:   Correct.   Thank you, Your Honor.

22          THE COURT:   Any rebuttal by the government?

23          MR. JOHNS:   Yes, Your Honor, there is.   However, as we

24   indicated earlier, our witnesses are not available at this time.

25          THE COURT:   How many rebuttal witnesses are you

196

1    we need time this afternoon, as well.

2              THE COURT:  Please.

3              We're in recess.

4              (Proceedings concluded at 4:41 p.m.)

5                          - - - - -

6

7

8    STATE  OF  CALIFORNIA )
                           )
9                          )
                           )      CR 04-374(A)-SJO
10                         )
     COUNTY OF LOS ANGELES )
11

12

13
         I hereby certify that the foregoing matter, entitled
14   THE UNITED STATES OF AMERICA versus RITA MARIE LAVELLE, is
     transcribed from the stenographic notes taken by me and is
15   a true and accurate transcription of the same.

16

17

18   *Deborah K. Gackle*                    December 16, 2004
     Deborah K. Gackle                      _____
19   CSR No. 7106                           Date

20

21

22

23

24

25