UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

- - - - -

THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

THE UNITED STATES OF AMERICA,      )
                                   )
                                   )
                   PLAINTIFF,      )
VS.                                )      CR 04-374(A)-SJO
                                   )
RITA MARIE LAVELLE,                )
                                   )
                   DEFENDANT.      )
                                   )

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

FRIDAY, SEPTEMBER 24, 2004

VOLUME IV OF V

DEBORAH K. GACKLE, CSR, RPR
Official Court Reporter
U.S. District Court
312 North Spring Street
Room 402-A
Los Angeles, CA  90012
(213) 620-1149

T R I A L   I N D E X

| PROCEEDINGS: | VOLUME | PAGE |
|---|---|---|
| MOTIONS IN LIMINE | I | 24 |
| JURY VOIR DIRE | I | 61 |
| OPENING STATEMENTS: | | |
| GOVERNMENT | II | 30 |
| DEFENSE | II | 45 |
| GOVERNMENT'S CASE IN CHIEF | II | 59 |
| GOVERNMENT RESTS | III | 119 |
| DEFENSE'S CASE IN CHIEF | III | 119 |
| DEFENSE RESTS | IV | 186 |
| GOVERNMENT'S ARGUMENT | IV | 33 |
| DEFENSE'S ARGUMENT | IV | 53 |
| GOVERNMENT'S CLOSING ARGUMENT | IV | 79 |
| JURY INSTRUCTED | IV | 18 |
| VERDICT | V | 9 |

- - - - -

1    verdict or have been discharged.

2           The term "vulnerable victim" means a person who is a

3    victim of the offense of conviction and who is unusually

4    vulnerable due to age, physical or mental condition, or who is

5    otherwise particularly susceptible to the criminal conduct.

6           That concludes the court's reading of the jury

7    instructions.  The record should reflect that all jurors were

8    present with the alternates, counsel and the parties.

9           As mentioned, counsel will now have the opportunity to

10   address you in argument.  This is the portion or time in the

11   trial where each side can argue their case to you.  Please

12   remember what has already been said or stated.  Statements of

13   counsel are not evidence.

14          The government commences the argument first, starts

15   first.  We'll hear from Ms. Kim.  Mr. Cephas will follow, and

16   then the government gets one final opportunity to address the

17   jury.

18          The government gets two opportunities and the defendant

19   only one opportunity because the government has the burden of

20   proof in this case.

21          Mrs. Kim.

22          MS. KIM:  Thank you, Your Honor.

23          THE COURT:  I would ask counsel, when you're making

24   reference to exhibits, to please make sure the exhibit number is

25   stated for purposes of recordkeeping.

1   There's no dispute that Joseph Bertelli, had he actually signed

2   those documents, could have been indebted for $52,130.

3       The special verdict form will also ask you to determine

4   whether or not at least one of the victims was vulnerable by

5   reason of their age or their physical condition.

6       And you've met Mr. Bertelli yourselves, ladies and

7   gentlemen.  There's no doubt that he was a vulnerable victim.

8   He is elderly, he is physically impaired, and, as you know, he

9   is a cancer survivor.  As you know, the defendant knew this at

10  the time she committed her fraud.

11      The special verdict form will also ask you to consider

12  whether there is more than one victim.  Ladies and gentlemen,

13  there are at least two victims in this case:  Capital Partners,

14  which actually gave the money to defendant; and Joseph Bertelli,

15  whose forged signature indebted him for $52,130.

16      Thank you, Your Honor.

17      MR. CEPHAS:  That's it.  Three-and-a-half years, more

18  than three-and-a-half years Agent Freihon's been working on this

19  case.  That's it.  Joe Johns, more than two years.  That's it?

20      Ladies and gentlemen, as I told you during the opening,

21  my client, Rita Lavelle, she is on trial not because of that she

22  did, but because of who she is.  She is on trial to give these

23  three people a chance to get in the news, a chance to get in the

24  headlines.

25      I told you how this case started:  It started from a

54

1  search warrant, a search warrant that Agent Freihon asked for,

2  and this is language from that search warrant which is Defense

3  Exhibit 106.  Paragraph 2 of her affidavit, it identifies Gene

4  Van Houten, Robert Cole, Denova.  In support of an arrest

5  warrant, Gene Van Houten, Robert Cole.  You don't see

6  Ms. Lavelle's name there.

7          You're going to get a chance to look at Exhibit 106.

8  You're going to see the whole search warrant.  You won't see her

9  name anywhere in there because she didn't do anything.

10          How did this case really start?  Well, when you get a

11  chance to look at this, look at page 20 of her affidavit.  And

12  in Exhibit 106, you're going to see where she indicated that on

13  January 18, Agent Freihon got a call from a county inspector.

14  Why?  Because earlier that day, this inspector decided to pull a

15  fast one on Denova.  He calls up Denova:  "I'm going to be over

16  in an hour.  I'm coming over to check out the lot, make sure

17  you're in compliance."  It's in there.  You'll get a chance to

18  see that.

19          Denova:  "Oh, cool.  We'll be here.  Come on over."

20          This inspector wasn't an hour's drive away in some

21  county building.  He was hiding in a lot across the street.  How

22  do I know that?  It's in here.  He was hiding in a lot because

23  he had suspected that they would be violating the law; he

24  suspected they were hiding hazardous materials in a tractor

25  trailer on the lot.

55

1          So he hangs up, hangs up his cell phone, and from the

2     bushes across the street, he watches.  And don't you know, but a

3     couple minutes later, some guy comes hustling out of the

4     building, jumps in a truck, backs up to a trailer and drives

5     off.

6          Well, he followed, and that trailer got pulled over.

7     Look at page 23 of her affidavit.  What did she find -- or

8     excuse me -- what did the inspector find?  Well, blasting caps,

9     fuses, military grenade fuses, rocket propellants, various live

10    military ordinance and inert military ordinance.  Significant.

11    This was before 9/11, but it's still somewhat significant.  But

12    the county had taken care of that.

13         But nevertheless, they called the FBI.  So Agent

14    Freihon decided, I'm going to pile on.  I'm going to see if I

15    can get anything out of Denova.  I'm going to get a search

16    warrant.  I'm going to talk to some people.  And so she does.

17    She gets that search warrant.  She goes over to Denova, and she

18    told you, when she was looking through documents, that is when

19    she first saw some of the LEMCO documents.  She saw Rita

20    Lavelle's name on these documents.  Wow, Rita Lavelle?  That is

21    that EPA lady.  She was in the news.  She was -- I think she was

22    big-time.  I think that was front-page news when she got

23    indicted.

24         Well, the focus of the investigation changed.  It now

25    became the Rita Lavelle investigation.

56

1      Well, Rita Lavelle cooperated, she cooperated over and

2   over again.  Agent Freihon told you she met with Ms. Lavelle in

3   early February.  She wanted to discuss the LEMCO matter,

4   supposedly the hazardous-waste issues, that Denova was really up

5   to.  And you saw Government's Exhibit 59.  After their meeting,

6   Ms. Lavelle wrote a memo, sent it to Agent Freihon, telling her

7   "Here's what you need.  You want to get Denova, here's what you

8   need to go after them for the hazardous waste."

9      Ms. Lavelle thought the hazardous waste was a serious

10   issue.  Who knew it really wasn't?

11      Now, Agent Freihon also told you that in the same month

12   of February, she subpoenaed all of Denova's records regarding

13   the LEMCO issue, she subpoenaed Capital Partners' records, and

14   she also took all of Ms. Lavelle's documents.  She took them

15   all.  Didn't leave her a copy.  February 2001, she had all of

16   the originals of Ms. Lavelle's relating to LEMCO.

17      You remember she also told you when she went to pick up

18   those documents, Ms. Lavelle had the Denova documents in a box

19   relating to the hazardous-waste investigation that Ms. Lavelle

20   thought was the purpose of the meeting.  But Agent Freihon told

21   you, "Well, I wanted those other copies.  I wanted the LEMCO

22   documents."

23      Ms. Lavelle didn't understand why, but, nevertheless,

24   "Take them, take the documents."

25      So Agent Freihon had those documents, and she's had

57

1    them for over three-and-a-half years.

2          What happens next?  Well, a target letter goes out at

3    some point.  But on October 17, 2002, Rita Lavelle goes in to

4    meet with Joe Johns and Agent Freihon.  Met with them for hours.

5    But what happened before that meeting?  Well, Agent Freihon told

6    you what happened.  She gathered up all her documents, all the

7    Capital Partner documents, all the Denova documents, all the

8    Rita Lavelle documents, and she reviewed them.  She knew what

9    happened.  She knew what happened more than two years prior to

10   this October 17th meeting.

11         Rita Lavelle comes in, talks for hours.  They ask her a

12   lot of questions.  And how do they ask those questions?  "Rita,

13   we have all the documents.  We're not going to show you any of

14   them."  Now, without seeing these documents, I want you to tell

15   me, when did you send them?"  "Two years ago."  Tells them.

16   "I'm not showing you."  "Please, can I see them?"  "No, tell me.

17   You want to go to jail?  Tell me."  They didn't show her the

18   documents.

19         So she says, "Well, I don't even know what the question

20   was because I don't believe there's any evidence that the

21   question was in evidence."  But let's say they asked her a

22   question, and they said, "Clarify something for us."  She writes

23   down on her declaration -- and now I'm referring to Defense

24   Exhibit 107, page 7. She writes down, "I never gave Capital

25   Partners any documents until after the problem emerged."

1        Agent Freihon told you several times she knew that

2   there was a serious problem with Rita Lavelle in August of 2000.

3   Agent Freihon told you that she could have asked Rita Lavelle to

4   clarify that by -- what she meant by "the problem." She told

5   you she could have asked her to clarify it. But she didn't.

6   Why? Would have been harder to get an indictment if it was

7   clarified. She didn't want anybody to know what it meant by

8   "problem emerged."

9        Now, there's also a false statement claim regarding

10  Rita Lavelle being asked what accounts receivable was factored

11  by Capital Partners?

12       Well, on page 4 of Rita Lavelle's declaration -- again,

13  Defense Exhibit 107 -- Rita Lavelle explained in writing where

14  she believed the invoice that was factored came from. And Agent

15  Freihon told you that she believed that invoice was referring to

16  the invoice that started out as a purchase order.

17       So, in fact, it's clear from the declaration that Rita

18  Lavelle, on October 17, 2002, told Joe Johns, told Agent

19  Freihon, that was factored. But that is not the question that

20  led to a false statement claim.

21       The question was, allegedly, "What accounts receivable

22  was factored?"

23       Well, if you recall from Sean Walden's testimony, there

24  was no accounts receivable factored. They don't factor accounts

25  receivable. They factor purchase orders. They factor invoices.

59

1        So Rita Lavelle says, "I don't know."  Was she confused

2   by his question?  I don't know.  Because they didn't write it

3   down anywhere; they didn't ask her to clarify that that question

4   was ever asked so that they could show you this; they didn't

5   tape record any of this so that they could let you hear what was

6   said on that day.  Why?  It's harder to get an indictment that

7   way.  It's really hard to get a conviction that way.

8        It's much easier to show you bits and pieces of a case.

9   And then hope you don't ask any questions.  And then hope that

10  the defense doesn't pay attention.  There were no false

11  statements here.  There was no wire fraud here.  This case

12  should have never been brought.

13       Let's look at Government's Exhibit 20, page 1, which is

14  the August 28th letter to Sean Walden.

15       Well, you notice Rita Lavelle references "purchase

16  order," purchase order for the project.  In testimony from

17  several witnesses, explain purchase order is not a debt.  No one

18  was indebted by this purchase order.  It was a request for

19  services.  That is what it was.

20       Sean Walden testified that he knew he was given an

21  advance on a purchase order and that he knew that the work

22  wasn't going to be done in at least four to six weeks.  He knew

23  it was a P.O. for work that hadn't been done, Cole apparently

24  knew it was a P.O. for work that hadn't been done, and Rita

25  Lavelle certainly knew the same thing.

1          Last page of that same Government Exhibit 20, and it's

2     the purchase order.

3          Now, Mr. Johns made much of the fact that in a couple

4     of miscellaneous letters sent after this date, the word

5     "invoice" was used instead of "purchase order."  Well, clearly

6     it says "purchase order" here, and it clearly says this

7     "invoice" here.

8          How do I explain that?  I don't have to explain it.

9     It's not significant.  Everyone on each side of this deal knew a

10    purchase order was submitted for an advance.

11         Now, at some point, somebody turned that purchase order

12    into an invoice.  And this invoices page 2 of Government

13    Exhibit 26, which you'll get to see.  Unlike the purchase order,

14    there is no signature from Mr. Bertelli on it, and if you

15    recall -- well, let me focus you up here, the language:

16    "August 29th from Denova."  That invoice was faxed from Denova

17    on August 29th.

18         Well, where did that invoice come from?  Who made it?

19    Well, Joe Johns -- who usually has a nice, folksy manner, talks

20    to the jury like this -- tried to convince you that Rita Lavelle

21    did it by saying, "Isn't it true you did that invoice?"  Doesn't

22    work for him; it's not his style.

23         What do we know?  We know that Agent Freihon talked to

24    Paul Schwartz, the controller at Denova.  We know that Paul

25    Schwartz told her somebody named Patty made that invoice at Bob

1   Cole's or Gene Van Houten's request.  Now, there was a limiting

2   instruction on that.  That's not proof that Patty did it, that

3   is not proof that Patty did it at Gene Van Houten's or Bob

4   Cole's request.

5           So what does Agent Freihon do?  Talk to Patty?  No.

6   She might find out something she doesn't want to hear.  She told

7   you she didn't talk to Patty.  She told you she never found out

8   who did the invoice.  Stopped Joe Johns from accusing Rita

9   Lavelle of doing the invoice?  Don't let the lack of

10  investigation get in the way of a prosecution.  Of course not.

11  He asked it anyway.  What about Sean Walden?

12          Mr. Walden says he would have never agreed to this deal

13  if he knew that Rita Lavelle signed some of these documents

14  instead of Mr. Bertelli.

15          You saw Mr. Bertelli.  He came in, he testified.  I

16  don't know what his condition was four years ago, but we know he

17  had serious health problems four years ago.  Can he sign his

18  name in the condition he is in?  Maybe, maybe not.  We don't

19  know.

20          Is it reasonable to assume that sometimes other people

21  sign for him?  Well, Ms. Lavelle met with Agent Freihon in

22  February, and she said, "I signed for him sometimes.  Other

23  times, he signed himself."  She repeated that when she met with

24  them in October the following year; she repeated it in front of

25  the grand jury.  Let's get back to the grand jury for a second.

1    Rita Lavelle came in and testified before the grand

2    jury, but she wasn't subpoenaed to testify.  Mr. Johns read you

3    those long admonitions where he said, "Whoa, it's rare, targets

4    don't do this?  She is like, no problem, no problem.  I want to

5    do it.

6         What was she brought in there for?  One thing and one

7    thing only:  She was brought in to give a handwriting exemplar

8    so that Agent Freihon could have it tested to determine whose

9    handwriting was on some of the Bertelli signatures versus

10   others.  That is the only reason she was called to the grand

11   jury, for that handwriting sample.  What did they do with the

12   sample?  Agent Freihon told you:  Nothing.  Why bother?  She had

13   already testified she signed sometimes and didn't other times.

14   Let's not confuse this prosecution with evidence.  Let's get

15   back to Sean Walden.

16        He says he didn't know.  He says he wouldn't have

17   agreed had he known she signed any of those documents.  Well,

18   Defense Exhibit 104 will be back in the jury room.  You'll get a

19   chance to look at these documents.  These are the documents that

20   went -- excuse me -- these are the documents that Agent Freihon

21   told you came from Capital Partners.  She took these documents

22   from Capital Partners in February, 2001, shortly after the

23   investigation started.

24        Well, you heard Mr. Bertelli tell you there was some

25   document that Rita Lavelle had that permitted her to sign

1   everything under the sun -- his words -- everything under the

2   sun.

3          And he was shown a document and he said, "No, that is

4   not it.  It was something else."  But in Exhibit 104, that

5   document that I showed Mr. Bertelli is there.  Now, I'm not

6   saying this document has any legal effect; I don't know the

7   purpose of that document.  But one thing I know that document

8   establishes is that this document was in Sean Walden's

9   possession.

10          So Sean Walden was on notice, irrespective of whether

11   this document was the one that gave her power to sign everything

12   under the sun.  According to Mr. Bertelli, it's not.  But it at

13   least had to have told Sean Walden it looks like Rita Lavelle

14   might be signing for Bertelli.  He had to know.  Of course he

15   knew.  He had that document in his file.  And what else did Sean

16   Walden tell you?

17          Well, he gave his fanciful tale that the reason he

18   approved the advance is because he had a guarantee and he could

19   attach Mr. Bertelli's bank account.  What about that guarantee?

20   The guarantee was between Denova and LEMCO.  You'll get a chance

21   to look at that guarantee.  None of you will find that Capital

22   Partners is a party to that guarantee.  Does nothing for you.

23          Sean Walden said he believed the guarantee would

24   require payment from LEMCO even if work was never done.  That is

25   just not logical.  If you want to hire a contractor to have work

1   done in your kitchen and you sign a guarantee to pay the

2   contractor for work performed and then the contractor never

3   shows up, you have to pay on that guarantee?  Of course not.

4   And work was never done here.  But there's also the issue of the

5   credit check.

6          Mr. Walden told you he ran a credit check on LEMCO:

7   Insufficient credit.  He ran a credit check for Mr. Bertelli:

8   Insufficient credit.  So he's got this guy in this company with

9   lousy credit, "But I got that guarantee, so I know I can go

10  after these guys with lousy credit if somebody doesn't pay."

11         "Well, if the guarantee doesn't work, I'm going to

12  attach that bank account."  But, remember, this is the bank

13  account that Mr. Walden said he didn't know if there were $10 or

14  $10,000 in that bank account.

15         How is that bank account, that he doesn't even know has

16  funds in it, going to give him any satisfaction?  It's not.  It

17  didn't.  Mr. Walden told you that Denova had advanced -- excuse

18  me -- Denova had factored over 700 invoices in the year 2000.

19  He estimated it was over $600,000 of advances.  And now don't

20  forget:  They're getting about 40 percent return on that.

21  $600,000 loaned out and a return of 40 percent.  That is

22  $240,000.  That is why he made this loan.  That is the easiest

23  money anybody could make.

24         And he also told you that when invoices weren't paid by

25  one of the client's customers, they just collect it from another

1   invoice.  He told you they always got paid.  He wasn't

2   concerned, and that's what happened here.  When he found out

3   that the job wasn't going to be done, he just turned to the

4   failsafe method that always gets the job done:  Take the money

5   from future invoices.

6          By January 15th, several days before Agent Freihon got

7   a call from that county inspector, this loan was paid off.

8   Capital Partners, this so-called victim, had made their 40

9   percent or more return on that invoice.  So why would Mr. Walden

10  lie about any of this?

11         First off, I don't know if he was lying.  He told you

12  his company had 25 to 35 clients, like Denova.  Well, Denova got

13  advances, factored, whichever term you want to use, over 700

14  invoices.  Multiply that times 25 to 35 of their clients, you're

15  well over 10,000 invoices for that year.  He didn't remember any

16  of them; he couldn't remember the biggest clients of Denova; he

17  couldn't remember the dollar values; and until he looked at the

18  schedule, he couldn't even remember the numbers of transactions

19  for Denova.

20         Was he lying or was he just mistaken?  I don't know.

21  But how could he recall every invoice out of over 10,000 a year?

22  He couldn't.  So why would he lie?  Well, remember, he explained

23  to you that if a company brought in an invoice for $100,000,

24  that factoring rate applied would be 27 percent.  But the

25  advance would be 70,000.  But what would the interest be?  Well,

1    for a year, the cost of that $70,000 loan would be 20 percent of

2    a hundred thousand, not 27 percent of 70.   You'd be paying

3    $27,000 interest on a loan of 70,000 thousand.   Well, that is

4    not 27 percent, that's almost 40 percent.   But they don't tell

5    you that.

6              Is that fraud to tell somebody that "I'm charging you

7    27 percent" when I'm really charging you 40?   I don't know.   Ask

8    these people.   They're the experts.

9              But maybe that is what Sean Walden had to hide.   FBI

10   agents are poking around.   They're telling people they charge 27

11   percent when they charge 40.   Motive to fabricate?

12             And then he got fired, the FBI grabs all the documents.

13   A short while later, he is out in the unemployment line looking

14   for work.   But he told, "Had nothing to do with this, nothing to

15   do with my performance.   I was the top guy there.   Heck, I made

16   over $240,000 on Denova alone last year for the company."

17             So why did they fire him?   This guy was rolling in the

18   dough then.   It's ridiculous.

19             Ladies and gentlemen, after Rita Lavelle got the

20   payment, she didn't stop working.   She continued to work on the

21   LEMCO site.   You'll get a chance to see Defense Exhibit 108.

22   It's the work plan that was submitted to the EPA for the LEMCO

23   site on October 4th of 2000.   It's detailed.   There is a lot in

24   there because it required a lot of work.

25             And you heard testimony from John Jaros of the EPA, who

67

1    told you that at least as of November 8th, of 2000, she was

2    still working on the LEMCO project.  He confirmed a letter that

3    he had sent out on November 8 to Rita Lavelle.  That was

4    Defendant's Exhibit 19 from John Jaros.

5            Ladies and gentlemen, what about the signatures?  Joe

6    Johns kept referring in opening to forgeries.  He said

7    signatures were forged.  Well, you got a chance to look at

8    Government's Exhibit 78.  There was a signature card for

9    Mr. Bertelli.  And there was testimony from Mr. Bertelli that he

10   would only sign as Joseph V. Bertelli.  But as you can see on

11   the signature card, there are two approved -- at least two

12   approved signature forms:  One, Joseph V.  Bertelli; the other

13   one, Joseph Bertelli.

14           Well, what about the testimony from the inspector who

15   offered this, Paul Biren, who offered Government's Exhibit 58?

16   Now, he said he issued that to Mr. Bertelli.  You see it's

17   signed J.V. Bertelli.  I asked Mr. Biren, "Isn't it true that

18   Rita Lavelle was at that meeting and she signed this?"  Not

19   trying to hide the ball, just asked him that question.

20   "Absolutely not.  I am 100 percent sure."  That is what he said,

21   "One hundred percent sure Mr. Bertelli signed that."

22           "Are you certain?"

23           "Absolutely certain Bertelli signed it."

24           Ladies and gentlemen, now where are we?  Did

25   Mr. Bertelli sign this?  Did he sign any of these documents?

1  Was he mistaken when he said he didn't see certain documents?
2  We don't know.  We might have been able to answer that question
3  a little bit more if Agent Freihon had used the handwriting
4  exemplar and had the thing tested.  But, you know, that if she
5  gets a result she doesn't like?  Not going to do it, don't want
6  to know.  That is too dangerous, that's risky.
7         Ladies and gentlemen, there is no possible way that
8  this case can result in convictions for any of these counts.
9  This wire fraud count alleged the wire was the bank, the bank
10 transfer.  Well, you remember that a Wells Fargo employee -- I
11 believe her name was Wooley -- testified about Defense
12 Exhibit 101, and I showed her these highlighted items, "fed wire
13 received."  Said, "Oh, yeah, those are federal wires."  I showed
14 her a couple more, "Oh, yeah, those are federal wires."  And
15 then I showed her the one in this case.  "Hum, I don't know what
16 that is.  I don't know why that is a little different."
17        And Joe Johns steps right up, "Tell me what that is."
18        "I don't know.  I've never seen this before."
19        She didn't know.  Does this case have a federal wire?
20 It's unclear.  It's very unclear.
21        There are two false statement counts in this case, and
22 you have them there before you.  Now, the first claim about "I
23 never gave any documents" -- or excuse me -- defendant Lavelle
24 supposedly said she hadn't given any documents until after the
25 problem started.  That's what she -- that's what the statement

1   was.  There was no statement that -- "I didn't give any

2   documents until after November."  Is that a false statement?  We

3   don't know that the term "problem" really means in this case

4   because Agent Freihon decided not to clarify it.

5         Well, look at the court's instruction No. 26 that

6   you're going to get.  Is that statement, that she didn't give

7   any documents until after the problem started, false?  No.

8   Jurisdiction of the Federal Bureau of Investigation, we'll give

9   them that one.  Jurisdiction of the FBI is pretty much

10   everything.

11         "Statement was given with knowledge that it was

12   untrue."  Well, Ms. Lavelle wrote on her declaration, "This is

13   to the best of my recollection.  This is to the best of my

14   recollection, without the aid" -- again, I'm referring to

15   page 10 of Defense Exhibit 107.  "This is written to the best of

16   my recollection, without benefit of notes or other aid."

17         Did she know it was untrue?  She didn't even know

18   herself.  She wasn't sure.  Remember, she was being asked by

19   Agent Freihon, who was holding the stack of documents and

20   wouldn't let her see them.  She wasn't sure.

21         The government claims the statement was material.

22   Could have influenced the agency's decisions or activities.

23         (Discussion held off the record.)

24         THE COURT:  I think the jury needs a break.  So we'll

25   take a short recess.  Please return back to the courtroom at 25

1   after the hour.  We will continue with the trial.

2        During your absence, please do not discuss the case

3   among yourselves or with any other person.

4        (OPEN COURT - JURY NOT PRESENT:)

5        THE COURT:  Would you have a seat, please.  The jury is

6   excused.  I try to avoid interrupting argument, but it was

7   apparent it was close to an emergency.  We're in recess.

8        (OPEN COURT - JURY PRESENT:)

9        THE COURT:  The jury is reassembled, with the

10  alternates looking more comfortable.

11       Mr. Cephas.

12       MR. CEPHAS:  Thank you, Your Honor.

13       Ladies and gentlemen, there's no question in this case

14  that my client is not guilty of the crimes she's charged with,

15  and the evidence demonstrates her innocence.

16       But we're not required to prove innocence in the

17  system; we're not required to prove anything.  The burden is

18  completely on the prosecution to prove every element beyond a

19  reasonable doubt.

20       And, again, let's start with the two false statement

21  claims.

22       The first element of a false statement claim, that it

23  was a false statement.

24       Well, the indictment charges that the false statement

25  was, essentially, "I didn't send any documents until after

1    Capital Partners sent an invoice to Joe Bertelli."

2           But you saw page 7 of her declaration, that is not that

3    she wrote.  That she wrote is, "I didn't send any documents

4    until after the problem started."

5           We don't know that was meant by "problem" because the

6    agent didn't ask her to clarify.  Can that possibly be a false

7    statement beyond a reasonable doubt?  We don't know that it

8    means.

9           And then you also have to remember that Ms. Lavelle

10   wrote, "This is to the best of my recollection."

11          Nowhere did she say, "I'm absolutely certain of this

12   fact," she did not.  So it cannot possibly prove the first

13   element beyond a reasonable doubt.

14          Again, second one, jurisdiction of the FBI, they can

15   have it.

16          How about that the defendant acted with knowledge that

17   the statement was untrue?  Beyond a reasonable doubt?  Again,

18   remember, I'm not going to pick the documents up again, but she

19   asked her, "Tell me."

20          She could have shown her the documents, she could have

21   asked her to clarify.  The statement was made to the best of her

22   recollection.  Nowhere can they show that statement was made

23   with knowledge that it was untrue.

24          And then was the statement material?  Could it have

25   influenced aiding decisions or activities?  Well, now, remember:

1  Agent Freihon had reviewed all the documents, she told you that.

2  Reviewed all the documents before that October 17th, 2002

3  meeting.

4          She knew that happened backwards and forwards, she had

5  the documents with her.  Now, she asked Ms. Lavelle certain

6  questions.  She's got all these documents that show they went to

7  Capital Partners in August.

8          And she testified that she knew that when Ms. Lavelle

9  made her statements, she knew that, in her mind, those

10  statements were false because she thought that Ms. Lavelle was

11  referring to November by "the problem," and she knew it was

12  false because she had a stack of documents dated August.

13          Could that have influenced anybody beyond a reasonable

14  doubt?  Well, we know it couldn't have influenced this agent;

15  she had been involved in this case for over two years.

16          Could it have influenced another agent?  Well, you

17  can't just take an agent out of the audience who's never seen

18  anything in the case and say, "Hey, do you know about this

19  case?"  Of course it might influence, but that is not how you

20  make the determination.

21          Would another agent or any agent who is given access to

22  these documents, who has an opportunity to review all these

23  documents, and then is given the opportunity to ask Ms. Lavelle

24  a question, after looking at all these documents of August,

25  could anybody be influenced by that?

73

1        During voir dire, I asked one of the jurors if I told

2   him that Howard Dean was on the democratic ticket, could he be

3   confused by that.  Absolutely not.  Nobody could.  The only

4   person that could would be somebody who just came onto the

5   planet and had never read anything.

6        No reasonable person who is given access to the

7   documents that Agent Freihon had been given would be confused by

8   that statement.  Nobody could.  They cannot prove that beyond a

9   reasonable doubt.

10        Same thing with Count Three.  Now, in Count Three, the

11   government alleges that Ms. Lavelle was asked which account

12   receivable of Denova Capital Partners was factoring, and she

13   said she didn't know, when the government claims she really did

14   know.

15        Well, she wrote on another page of her declaration that

16   she did know that invoice was factored, it was that phony

17   invoice that somebody at Denova apparently doctored up that

18   started out from the purchase order, and the agent told you she

19   knew that's what Rita Lavelle was referring to in that statement

20   of her declaration.

21        So that is the false statement here if, in fact, that

22   question was asked?  Well, the false statement is, "I don't

23   know."  Is that false?

24        She was asking about accounts receivable.  Sean Walden

25   said they don't factor accounts receivable, they factor

1   purchases or invoices.  The question didn't make sense.  If the

2   question was asked, didn't make sense.  There is no false

3   statement in that count as a matter of law.

4          Jurisdiction of the FBI, throw that one in again.  They

5   can have it.  With knowledge of the statement wasn't true, I

6   don't know.  When somebody asks you a question, and you don't

7   understand it, and you say, "I don't know," how could that ever

8   be?

9          False beyond a reasonable doubt?  You can ask a person

10  their phone number sometimes and they'll forget it because

11  they're confused.  Is that a false statement?  No.  Can't be.

12  And could it have influenced this agent's decision?  No, it

13  didn't, couldn't have.

14         Could it have influenced anybody's?  How can "I don't

15  know," how can "I don't understand your question," change the

16  scope of an investigation when you have all the documents, and

17  when, on another page in the declaration, it says that invoice

18  was factored.

19         That cannot be a false statement beyond a reasonable

20  doubt as a matter of law.  Those two counts just cannot -- the

21  government cannot meet their burden on those two false statement

22  counts.

23         But what about the wire fraud count?  There are several

24  elements that the government would have to prove beyond a

25  reasonable doubt.  Well, I submit, the evidence shows

1    Ms. Lavelle didn't, but for the sake of argument, what does the

2    government have?

3         Do they have evidence beyond a reasonable doubt that

4    Rita Lavelle knowingly devised or knowingly participated in a

5    scheme or plan to defraud?  Well, all the parties here

6    understood a purchase order was going to be factored, a purchase

7    order was factored.  That's the scheme to defraud?

8         Sean Walden knew the work hadn't been done, he knew it

9    wasn't going to be done for four to six weeks, he knew it was

10   work that had not been done.

11        Promises or statements were false beyond a reasonable

12   doubt.  The government's case is confusing here.  It's unclear

13   that those promises or statements they're talking about, and are

14   they false beyond a reasonable doubt?  Again, their case just

15   doesn't even make any sense on this count.

16        Promises or statements made or facts omitted were

17   material?  Well, which promises?  Which statements?  Rita

18   Lavelle told the government over and over again she signed some

19   things and she didn't sign some other things.

20        They never chose to test it.  We don't know and we're

21   not going to know whether she signed the documents.  Is there

22   some uncertainty here?  There certainly is.  I -- withdraw that.

23        When Paul Biren got on the stand and said he is a

24   hundred percent certain that Mr. Bertelli signed that document,

25   that just threw a lot more uncertainty into this case.  They

1  Ms. Lavelle didn't, but for the sake of argument, what does the

2  government have?

3          Do they have evidence beyond a reasonable doubt that

4  Rita Lavelle knowingly devised or knowingly participated in a

5  scheme or plan to defraud?  Well, all the parties here

6  understood a purchase order was going to be factored, a purchase

7  order was factored.  That's the scheme to defraud?

8          Sean Walden knew the work hadn't been done, he knew it

9  wasn't going to be done for four to six weeks, he knew it was

10 work that had not been done.

11          Promises or statements were false beyond a reasonable

12 doubt.  The government's case is confusing here.  It's unclear

13 that those promises or statements they're talking about, and are

14 they false beyond a reasonable doubt?  Again, their case just

15 doesn't even make any sense on this count.

16          Promises or statements made or facts omitted were

17 material?  Well, which promises?  Which statements?  Rita

18 Lavelle told the government over and over again she signed some

19 things and she didn't sign some other things.

20          They never chose to test it.  We don't know and we're

21 not going to know whether she signed the documents.  Is there

22 some uncertainty here?  There certainly is.  I -- withdraw that.

23          When Paul Biren got on the stand and said he is a

24 hundred percent certain that Mr. Bertelli signed that document,

25 that just threw a lot more uncertainty into this case.  They

1   could have clarified had they chosen to use the handwriting

2   exemplars and tested, but, again, they didn't want to do that.

3            Intent to defraud, who had intent to defraud here?

4   Again, it was a purchase order.  All parties agreed that it was

5   a purchase order.  Sean Walden knew he was going to get paid no

6   matter that happened.

7            Rita Lavelle was owed money from Denova.  She was

8   getting her money.  Denova owed her money; they paid.  Walden

9   knew that he would get the money from other invoices at the end

10  of the day if, for some reason, that purchase order didn't get

11  paid, if the job wasn't done, and it didn't become an invoice.

12           Well, someone here created an invoice.  We don't know.

13  Agent Freihon could have done some investigation here to

14  determine who created that invoice.  She could have followed up,

15  she could have tried to locate Patty to determine if Patty did,

16  in fact, create that invoice, and, if so, why.

17           Was it a mistake by Denova or did Denova have intent to

18  defraud?  We don't know.  Those questions weren't asked; the

19  investigation was incomplete.

20           So where is the intent to defraud beyond a reasonable

21  doubt?  You can't look into only half the questions, purposely

22  ignore relevant evidence, ignore when somebody tells you, "I

23  think that is where the invoices started out."

24           I'm not going to go look, I'm just going to ask a jury

25  of 12 people to say, "Forget it."  Joe Johns asked Rita Lavelle,

77

1   you heard it, he asked Rita Lavelle did she make the invoice.

2   Isn't it true she made the invoice?

3           Well, isn't that enough for beyond a reasonable doubt?

4   Of course not.  Beyond a reasonable doubt, at a minimum, would

5   have required Agent Freihon to go talk to Patty.  That wasn't

6   done.

7           And as soon as Rita Lavelle saw the invoice in

8   November, Government Exhibit 37 got sent out to Cole, Van Houten

9   and Walden, and it said -- she said to them, "No waste has left

10  LEMCO."

11          There is no invoice for this purchase order.  She had

12  never seen that purchase order before.  There's no evidence she

13  had seen that purchase order.

14          So did the government prove intent to defraud beyond a

15  reasonable doubt?  Well, maybe for Capital Partners telling

16  people their interest rate is 27 percent when, in reality, it's

17  closer to 40, but not by Rita Lavelle.

18          They did not show any intent to defraud, they certainly

19  didn't come close.  Not even on the same planet as intent to

20  defraud beyond a reasonable doubt.

21          THE COURT:  Mr. Cephas, will you please conclude your

22  argument.

23          MR. CEPHAS:  Yes, Your Honor.

24          And then finally, wire transfer across state lines,

25  beyond a reasonable doubt?  No.  They put someone else up from

1  Wells Fargo, I believe her name was Wooley.  She said she didn't

2  even know.  The government was trying to pull the wooley over

3  your eyes.  That is not beyond a reasonable doubt for the wire

4  transfer, it can't be.

5      So what is going to happen here?  Is history repeating

6  itself?  As I told you in opening, about 20 years ago, she was

7  indicted for contempt of Congress, Rita Lavelle was indicted for

8  contempt of Congress.

9      She went on trial in federal court, a jury of 12 people

10  acquitted, not guilty.  Two weeks later, they were right after

11  her again, another indictment.

12      Well, you heard Agent Freihon tell you, "Oh, we're

13  still investigating that hazardous waste stuff, that Denova

14  stuff.  Trust me, we're going to get around to that.  Oh, and

15  Rita Lavelle is still a target of that."

16      When they lose here, will she be reindicted like what

17  happened 20 years ago?  I don't know.  They have the power to do

18  that.  That is their determination.  I'm not going to worry

19  about that.  But they have shown in this case, they cannot be

20  trusted with that power.  But I'm not going to worry about what

21  happens tomorrow, I'm worrying about what happens here today.

22      Ladies and gentlemen, Rita Lavelle is not guilty of any

23  of these charges.  Individuals here have their chance to finally

24  make front page of the news and give them a news story.  Go

25  back, vote not guilty in ten minutes, and come right back here

79

1   and then go home for the weekend.

2          THE COURT:  Mr. Cephas, please conclude.

3          MR. CEPHAS:  Thank you, ladies and gentlemen.

4          THE COURT:  Thank you.

5          Ms. Kim, closing.

6          MS. KIM:  Yes, Your Honor.

7          Ladies and gentlemen, you've heard numerous times:

8   Nothing I say is evidence, nothing defense counsel says is

9   evidence, nothing he says is evidence, nothing outside of what

10  you've heard from the witness box, nothing outside from the

11  documents that you received is evidence.

12         So why all this talk about Special Agent Freihon, her

13  stack of documents, and yelling at the defendant?  All of this

14  talk is a distraction.  It's an effort to deflect your attention

15  to the matter at hand.

16         The matter at hand is Count One, a wire fraud count;

17  Count Two and Count Three, false statement counts.

18         Ladies and gentlemen, the defendant has demonstrated

19  she is someone who deflects attention.  She talks about her

20  prior conviction, that is not her fault.  It's politics,

21  politics in Washington, D.C., not her fault.

22         When Special Agent Freihon wants to talk to her about a

23  LEMCO-backed scheme, she deflects, "Let me tell you about

24  Denova.  Let me tell you about Denova and their waste management

25  problems."

```
STATE   OF   CALIFORNIA )
                        )
                        )   CR 04-374(A)-SJO
                        )
COUNTY OF LOS ANGELES   )
```

     I hereby certify that the foregoing matter, entitled
THE UNITED STATES OF AMERICA versus RITA MARIE LAVELLE, is
transcribed from the stenographic notes taken by me and is
a true and accurate transcription of the same.


_Deborah K. Gackle_

Deborah K. Gackle
CSR No. 7106

December 16, 2004

Date

126